Pennsylvania Public Utility Commission of the Commonwealth of Pennsylvania, Appellee, *v.* Pennsylvania Gas and Water Company (Water Division), Appellant.

Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Appellee, *v.* City of Scranton, Appellant, Pennsylvania Gas & Water Co., Intervening Appellee, Carbondale Area School District, Intervening Appellant.

Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Appellee, *v.* County of Lackawanna, Appellant, Pennsylvania Gas & Water Co., Intervening Appellee, Carbondale Area School District, Intervening Appellant.

Argued February 3, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Charles E. Thomas,* with him *D. Mark Thomas, Jack F. Aschinger,* and, of counsel *Metzger, Hafer, Keefer,*

*Thomas and Wood,* for appellant-intervening appellee, Pennsylvania Gas and Water Company.

*Dominic J. Ferraro,* Assistant Counsel, with him *Edward Munce,* Acting Counsel, for appellee.

*W. Boyd Hughes,* Assistant Solicitor, City of Scranton, with him *James J. Ligi,* Solicitor, Lackawanna County, and *William J. Purcell,* for appellants, City of Scranton, and County of Lackawanna, and for intervening appellant, Carbondale Area School District.

OPINION BY JUDGE KRAMER May 27, 1975:

This opinion involves three appeals taken from a long-form order, dated July 9, 1974, issued by the Pennsylvania Public Utility Commission (PUC). The PUC order is typical of the extensive, complicated, and technical adjudication usually involved in a public utility rate case. The pertinent procedural and factual aspects of the case, together with the parties involved in this appeal, will be described hereinafter.

The public utility involved is the Pennsylvania Gas and Water Company (PG&W). It is a combination public utility[1] rendering both natural gas service and water service. At the end of the test year, September 30, 1972, it rendered public utility water service to 145,726 consuming units, in a 165 square mile area, stretching from Forest City in Susquehanna County on the north, to Glen Lyon in Luzerne County 70 miles to the south. Its water service area incudes 60 municipalities, including Scranton and Wilkes-Barre. Its service area is divided into two divisions, viz., Spring Brook Division, and Scranton Division, which, for all practical purposes, are

---

1. PG&W is a combination public utility in that it renders natural gas service as well as water service. No issues have been raised concerning the allocation of costs or expenses incurred in this joint operation.

not interconnected. It supplies water service from over 60 reservoirs and various water wells situated in mountainous regions, and operates for the most part on a gravity-flow basis, with a storage capacity of over 21 billion gallons. PG&W transmits its water through 1,600 miles of water mains.

This case had its beginning on January 30, 1973, when PG&W filed various supplements to its tariffs under which it proposed to increase its water rates so as to produce a total annual increase in revenue of $4,870,103, or approximately a 50 percent increase over the then existing rates, exclusive of the state tax adjustment surcharge.[2] All of the filed supplements were to become effective April 1, 1973, but they were subsequently and voluntarily postponed, to become effective April 12, 1973. The increased rates were to affect all of its customers, except municipalities and public fire-protection consuming units. Some of the supplements, calculated to produce $2,213,683 of additional revenue, were permitted to become effective April 12, 1973. The remainder of the supplements were suspended by the PUC for the full statutory suspension periods of nine months, to January 12, 1974. PG&W *voluntarily* extended the suspension period

---

2. The following chart shows the pertinent detail on the various supplements:

    PG&W Tariff Water—Pa. P.U.C. No. 3 (Spring Brook Division)

        Supp. No. 8—increase $1,299,949—collected from April 12, 1973.

        Supp. No. 9—increase $1,559,939—not collected.

    PG&W Tariff Water—Pa. P.U.C. No. 4 (Scranton Division)

        Supp. No. 9—increase $913,734 collected from April 12, 1973.

        Supp. No. 10—increase $1,096,481—not collected.

There was another supplement to Tariff Water—Pa. No. 5 which in effect transferred service thereunder to Tariff Water—Pa. P.U.C. No. 4 (Scranton Division).

to March 15, 1974. On March 14, 1974, the PUC fixed the then effective rates of that date as temporary rates, until final order.

Twenty-three formal complaints were filed, all of which were consolidated for the purpose of the hearings. Three of the complaints were withdrawn or dismissed. From a reading of the record we can state that in reality only the City of Scranton and the County of Lackawanna (hereinafter referred to as complainants) actively participated at the hearings. After 13 days of hearings (over 1,300 pages of testimony and 32 exhibits), the PUC issued its long-form order from which came these appeals.

In its adjudication, the PUC found a fair value of $102,000,000 and a fair rate of return of 7.35 percent, thus providing income available for return in the amount of $7,497,000. This return, together with the PUC's findings on operating expenses, depreciation, taxes, and other adjustments set forth in the adjudication, led the PUC to conclude that the allowable annual revenues were $13,491,929, or $628,318 less than the total revenues sought by PG&W in its filings of the various supplements to its tariff mentioned above.

PG&W, the City of Scranton and the County of Lackawanna filed separate appeals to this Court. PG&W filed a petition to intervene in the appeals of the City and the County which was granted by this Court, after which all of the appeals were consolidated for disposition. On September 11, 1974, the Carbondale Area School District filed a petition to intervene, which was granted on that same date. However, PG&W filed a motion to quash the intervention by the school district as an appellant for the reason that the school district had not filed a timely appeal. Argument on the motion to quash was listed at the consolidated argument. Preliminarily, we will dispose of the motion to quash by stating that a party to an administrative proceeding with the right to appeal may not utilize a petition to intervene to obviate the statutory

time limit on appeal, and this Court is powerless to extend the mandatory statutory provisions. *See Pittsburgh v. Pennsylvania Public Utility Commission and Duquesne Light Company,* 3 Pa. Commonwealth Ct. 546, 284 A. 2d 808 (1971) and *Smith v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 252, 101 A. 2d 435 (1953). Therefore, we must grant the motion to quash.

Because these three appeals have been consolidated, we will deal with each of the issues raised in the various appeals under appropriate subtitles hereinafter.

Our scope of review is limited by statute. In section 1107 of the Public Utility Law (Act), Act of May 28, 1937, P.L. 1053, *as amended,* 66 P.S. §1437, we find:

"The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the findings, determination, or order of the commission, or violation of constitutional rights."

We have stated in a recent opinion that this section of the statute means that the appellate courts cannot conceive an independent judgment from the record, and substitute it for the judgment of the PUC. We may not indulge in the process of weighing evidence and resolving conflicts in testimony. The PUC's discretionary findings and conclusions must be accepted unless they are totally without support in the record, are based on error of law, or are unconstitutional. *See Lower Paxton Township v. Commonwealth of Pennsylvania, Public Utility Commission,* 13 Pa. Commonwealth Ct. 135, 317 A. 2d 917 (1974) and *Johnstown-Pittsburgh Express, Inc. v. Public Utility Commission,* 5 Pa. Commonwealth Ct. 521, 291 A. 2d 545 (1972). With these guidelines in mind, we now turn to the specific issues raised in these three appeals.

## I. RATE BASE EXCLUSION

To understand the issue involved here, it is necessary to set forth some pertinent facts. At some time prior to

1969 the Commonwealth of Pennsylvania, acting through its Department of Highways (now known as the Pennsylvania Department of Transportation and hereinafter referred to as PennDOT), proposed to construct portions of Interstate Route 81-E and Interstate Route 84 through a portion of PG&W's service area, rendering "useless" one of PG&W's reservoirs and the Roaring Brook watershed. The proposed action directly affected approximately 13 square miles of watershed used to deliver water to PG&W's customers. The effect of PennDOT's construction would have destroyed, for all practical purposes, the water supply then existing for the City of Scranton. As a result of years of negotiations between PennDOT and PG&W, on October 21, 1969, they entered into an agreement setting forth a compromise on the reimbursement by PennDOT to PG&W for the expected damages to its water supply system. Under this agreement PG&W was paid $2,754,753.56. The determination of the damages paid was based upon what is known as a "cost-to-cure" method, i.e., the estimated cost to replace the company's water supply facilities rendered useless as a result of the proposed highway construction. The agreement specifically set forth that $1,703,103.56 represented the cost of the construction of pipeline facilities and $1,051,650 for the cost of construction of a new dam and reservoir to substitute and replace the facilities taken by the proposed highway construction. The record indicates that PG&W constructed 32,000 feet of 30-inch pipeline, and a 1.3 billion gallon capacity reservoir, and that these new facilities created additional supply capacity over and above the capacity of the facilities actually rendered useless by the PennDOT construction. PG&W invested an additional $243,202 in the pipeline construction, and $4,122,290 additional funds for the new reservoir. In other words, PG&W used all of the monies paid under the agreement by PennDOT for new facilities, and as a result of the entire transaction, spent substantial additional sums.

Based generally upon equitable principles, the PUC termed the payment by PennDOT as a contribution or "contributed property" and concluded that it would disallow from the original cost measure of value $2,558,634, which is the amount deemed to be the net figure, after deducting PG&W's unrecovered investment in plant resulting from the transaction. The end results of this deduction from the rate base were (1) that PG&W was not permitted to earn anything on the dollars of investment in plant, used and useful in the public service, which the PUC characterized as having been "contributed" by PennDOT; and (2) the incomprehensible inclusion in the rate base of $196,120, representing the unrecovered investment in plant no longer in service. Annual depreciation allowance was likewise affected.

PG&W, in its appeal to this Court, contends that the PUC erred in excluding this investment in plant from both the company's original cost measure of value and the fair value determination, and in ordering such part-payment of PennDOT to be accounted for as a contribution in aid of construction for accounting and rate-making purposes.

This very same issue was presented to this Court in *Keystone Water Company, White Deer District v. Pennsylvania Public Utility Commission,* 19 Pa. Commonwealth Ct. 292, 339 A. 2d 873 (1975), the opinion for which is filed simultaneously herewith. In *Keystone* the sole issue was whether the PUC could exclude from the rate base monies paid by PennDOT as damages for the taking of part of the property of a public utility when the monies received were reinvested in plant used and useful in the public service. We there held that it was error for the PUC to exclude such plant from the rate base. Everything we said there is equally applicable here, and there is no need to repeat the principles upon which we based our holding. If there is any distinction between *Keystone* and this case, it is that this case is stronger since here PG&W

was forced to secure a new source of water supply and expend considerable sums of money, in addition to the payment made by PennDOT, to provide an equivalent or better source of supply and facilities for service to its customers. Once again, referring to the principles we set forth in *Keystone,* we summarize our disposition of this issue by stating (1) that the agreement between PennDOT and PG&W dated October 21, 1969, was legally the payment of damages for property taken by PennDOT, even though the determination of those damages was based upon a cost-to-cure basis; (2) that the damages paid under that agreement and the facilities built therewith are solely the property of the stockholders of PG&W in which neither the public nor PG&W's customers have any property interest; (3) that for rate case purposes the source of the funds utilized in the construction or purchase of plant devoted to the public service of a public utility is irrelevant, unless such monies are purely donations, contributions in aid of construction, or customers' advances for construction (which the monies here in question are not); (4) that plant used in the public service by a public utility obtained and financed by damage payments for property taken to permit highway construction must be included in the rate base; (5) that annual depreciation must be allowed on such plant; and (6) that under the facts of this case and the facts of *Keystone* and the provisions of the uniform system of accounts for water utilities, the amount of money received as damages by PG&W from PennDOT in excess of the dollars representing the undepreciated property actually taken should be accounted for by PG&W in account 401 entitled "Miscellaneous Credits to Surplus." For a complete understanding of our holding on this issue, the reader is referred to our opinion in *Keystone, supra.* As a result of our holdings, this matter must be remanded to the PUC for a redetermination of the rate base so as to include the $2,558,634 in original cost, and

determine the effect of its inclusion on any other measures of value utilized by the PUC in determining fair value. In addition the PUC's allowance for annual depreciation will have to be increased accordingly.

At this point we should mention that the complainants mistakenly contend, in an issue arising from the fair value determination of the PUC, that somehow the PUC failed to exclude this PennDOT payment from its determination of fair value. Our careful reading of the PUC's adjudication permits us to conclude that the PUC did exclude the PennDOT payment from all measures of value, including fair value.

## II. FAIR VALUE

PG&W presented evidence that its total net original cost for both divisions amounted to $68,288,857. The PUC accepted this evidence, with the exception of the so-called "contributed property" mentioned above. On the basis of the average of measures of value at depreciated original cost, and trended original cost depreciated at five-year average prices, PG&W contended that the fair value of its plant should be $123,184,391 and, in addition, based upon its claim for an increase in value based upon the current inflation, it contended that a fair value of $130,-000,000 would be more realistic. Complainants contended that the maximum fair value should be $91,900,000, and their contention was based upon a weighting of original cost and trended original cost at five-year average prices, based upon the capital structure ratios of PG&W. After discussing at great length the evidence produced and properly noting that there was no set formula, to which it was bound, the PUC set a fair value as of September 30, 1972, at $102,000,000.

PG&W contends that the fair value set by the PUC is so low as to constitute a manifest abuse of discretion. It attempted to prove its point by referring back to a finding of the PUC on the rate base in a prior case (in

1959) involving PG&W, and then adding only the increase in original cost (not fair value) to the finding of fair value in the prior case. From this illustration, PG&W argues that fair value could not be less than $105,000,000. The problem with PG&W's argument is that the Commission's responsibility is to determine fair value as of the end of the test period used in *this* rate case. What may have been fair value at another time is not necessarily fair value 15 years later. If PG&W had intended to use this approach to determine fair value, it should have undertaken the burden of proving that there have been no changed factual circumstances occurring subsequent to the prior finding of fair value. This PG&W did not do. *See Baltimore and Ohio Railroad Company v. Pennsylvania Public Utility Commission*, 135 Pa. Superior Ct. 20, 24, 4 A. 2d 628, 630 (1938) and *Cheltenham & Abington Sewerage Company v. Public Service Commission*, 122 Pa. Superior Ct. 252, 264-65, 186 A. 149, 156 (1936). There is evidence in the record that costs, generally, rose materially since the test year in the prior case, but all of those factors were taken into account in the trending processes used by the PUC, and all of the parties to this case, and, therefore, PG&W's contention in this regard is without merit.

PG&W next contends that the weight to be given trended original cost in the finding of fair value by the PUC was in error. On the subject of weighting, our courts have said many times that there is no particular formula which can be applied to determine fair value. In *Duquesne Light Company v. Pennsylvania Public Utility Commission*, 176 Pa. Superior Ct. 568, 580-81, 107 A. 2d 745, 750-51 (1954), our Superior Court stated:

> "Essentially, it would appear that the question involved here is one of the weight to be given the trended cost evidence. Such evidence is merely a guide in the determination of fair value. It cannot be seriously contended that even under the best of conditions

it is free from error, and the fact that it does contain defects would not justify the Commission in rejecting it. So long as the evidence is reasonably accurate, the weight to be given it is a matter for the Commission." In *Pittsburgh v. Pennsylvania Public Utility Commission*, 187 Pa. Superior Ct. 341, 350-51, 144 A. 2d 648, 654 (1958), the Court said:

"The apparent purpose of the requirement that the commission exercise its judgment upon all the relevant facts and not confine itself to any one particular measure of value is to arrive at a rate base which is fair to both the utility and to the customer. . . . To be fair to both the utility and the customer generally requires that the commission reject as the predominant measure of value any particular measure which would be unreasonably advantageous to one at the expense of the other of the component interests which the commission is required to keep in balance in the public interest." (Citation omitted.)

PG&W argues that there is support in the law, and from prior adjudications of the Commission, for the establishment of fair value at a point near the average of a depreciated original cost and depreciated trended original cost at five-year average prices. In *Johnstown v. Pennsylvania Public Utility Commission*, 184 Pa. Superior Ct. 56, 66, 133 A. 2d 246, 251 (1957), our Superior Court observed that ". . . without approving any formula . . . the commission has been inclined to establish a definite finding of fair value, when one is made, at a point near the average of original cost depreciated and a reproduction cost depreciated." If the PUC had applied such a formula to the statistics in this case, there is no question but that the fair value would have been set at something in excess of $102,000,000. The fair value found by the PUC ($102,000,000) is approximately 84 percent of the amount determined by the averaging method which apparently has been used by the PUC in at least 12

major water utility rate adjudications since 1971. This is one of those areas in which our scope of review restrains us from substituting our judgment for that of the PUC. While our review of this record would lead us to believe that the fair value found by the PUC is low when compared with what it found as fair value in other cases, a fair value which is approximately 150 percent of the net original cost as found by the PUC, cannot be said to be an abuse of discretion *per se.*

The complainants in their appeals raise additional issues relating to fair value. They contend that (1) the PUC failed to take into account labor productivity growth, which they claim is applicable to each and any year of construction; and (2) the PUC erred in not making sufficient or adequate findings of fact from which they (complainants) could determine the exact weight which the Commission applied to the original cost figures and to the trended original cost figures.

The PUC rejected the complainants' contention on productivity growth by observing that the trending statistics used reflected to some extent increased productivity by labor through the use of machines. The PUC also questioned the credibility of complainants' witness. Our review of the record permits us to conclude that the PUC did not abuse its discretion in its consideration of productivity growth.

With regard to the weight to be given to the various factors utilized in arriving at a fair value, the law is quite clear that there is no magical formula. Section 311 of the Act, 66 P. S. §1151, (Supp. 1974-1975), states in pertinent part:

> "The commission may, after reasonable notice and hearing, ascertain and fix the fair value of the whole or any part of the property of any public utility, in so far as the same is material to the exercise of the jurisdiction of the Commission. . . ."

The PUC is given some direction in section 1005 of the Act, 66 P.S. §1395, which provides:

"After the conclusion of the hearing, the commission shall make and file its findings and order with its opinion, if any. Its findings shall be in sufficient detail to enable *the court on appeal,* to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence. . . ." (Emphasis added.)

The fair value figure represents a judgment to be made by the PUC within its discretion, and there is no magical mathematical formula to which the PUC is bound in determining fair value. *See Pittsburgh v. Pennsylvania Public Utility Commission, supra; Equitable Gas Company v. Pennsylvania Public Utility Commission,* 160 Pa. Superior Ct., 458, 51 A. 2d 497 (1947). The PUC must consider all relevant elements and factors having a bearing on fair value, including original cost and trended original cost. *Pittsburgh v. Pennsylvania Public Utility Commission, supra; Equitable Gas Company v. Pennsylvania Public Utility Commission, supra.* In *Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 195, 90 A. 2d 607, 612 (1952), our Superior Court stated:

"The weight to be given any particular measure of value, such as original cost or reproduction cost [trended original cost], is for the Commission, but its action must be within the area of its administrative discretion and supported by the evidence."

Historically, and as approved by the Superior Court when it had jurisdiction to review utility rate adjudications, the PUC set and approved determinations of fair value at a point near the average of the original cost depreciated and the trended original cost depreciated. *See Johnstown v. Pennsylvania Public Utility Commission, supra; Pittsburgh v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 363, 366, 101 A. 2d 761, 763 (1954) ; *Orlosky v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 409, 413, 89 A. 2d 903, 906 (1952).

In this case PG&W submitted as evidence the following measures of value: (1) an original cost depreciated measure of value of $68,288,857 as of September 30, 1972 (the end of the test period) ; (2) a trended original cost depreciated measure of value at December 31, 1971 prices of $205,513,456; (3) a three-year average trended original cost depreciated measure of value of $186,789,909; (4) a five-year average trended original cost depreciated measure of value of $173,079,925; and (5) a bringdown fair value of $104,913,694. The complainants presented evidence which, after deducting the approximately two and a half million dollar payment by PennDOT mentioned above from the net original cost figures, indicated (1) a December 31, 1971 price level of $170,757,517; (2) a three-year average price level (ending December 31, 1971) of $156,487,514; and (3) a five-year average price level (ending December 31, 1971) of $150,127,913. Our reading of the record permits us to summarize all of this by stating that PG&W contended that the fair value could not be less than $123,000,000 and, after giving effect to inflation, $130,000,000, while the complainants argued that the fair value could not be more than $91,900,000. In its adjudication, the PUC outlined all of the evidence presented and concluded that, based upon all the credible evidence, the fair value should be $102,000,000. Complainants contend that the PUC is required to set forth specifically the weight which it gave to the various valuation factors.

The complainants state that the capital structure of the company should be utilized in determining the weight to be given the various elements considered in arriving at fair value. They argue that since the preferred stockholders and investors in the debt of the company have their return fixed by contract, only the common stockholders need to be considered in providing sufficient earnings for the company. As a result, they applied 68.3 percent (the percentage of the total capital structure

represented by debt, capital and preferred stock) to the net original cost valuation, and the remaining 31.7 percent to the five-year trended original cost figure. Through this method, the complainants arrived at a fair value of $91,900,000. While the complainants' argument has an appealing ring to it, and may have been used in other jurisdictions, the fact remains that this formula can lead to questionable results. If the PUC would adopt such a formula, what would it do with a public utility whose capital structure was 100 percent equity? If the complainants' contention is adopted, the fair value of the rate base of such a company would be set by the higher trended original cost figures. Furthermore, to be consistent, the PUC would also have to hold that the most current spot prices would have to be utilized rather than any five-year average trended price so as to adequately protect the current stockholders.

While we agree with the complainants that it would be preferable for the PUC to show in detail in its adjudication the method it used in arriving at the fair value, we believe, however, that there is sufficient detail in the adjudication in this case to permit this Court to conclude that the PUC did not abuse its discretion. There are no magical formulae which we can apply to test the reasonableness of the fair value set by the PUC. From our reading of the Act, we are certain only that the sole use of original cost statistics or the sole use of reproduction costs statistics would violate the legislative intent. We have no doubt that the Legislature intended an averaging process somewhere between the two extremes, and, so long as the fair value set by the PUC is not below or above those two extremes, or arbitrarily set so close to either extreme that we can discern a capricious disregard of the evidence or the law, we will not interfere.

### III.  FAIR RATE OF RETURN

In arriving at 7.35 percent as the fair rate of return, the PUC followed the usual method of determining the

actual capital structure of the company (equity, debt
and preferred stock), determining the cost for each
element, and then computing the weighted cost of each.
In arriving at the fair rate of return, the Commission
apparently used the following statistics:

TABLE 1

| Item | Capital Structure | Cost Rate | Weighted Cost |
|------|-------------------|-----------|---------------|
| Debt .............. | 57% | 5.9% | 3.36% |
| Preferred Stock .... | 11% | 4.59% | .50% |
| Common Equity .... | 32% | 10.90% | 3.49% |
| Total ........................... | | | 7.35% |

### A. Cost of Equity Capital

This element of the formula is the most speculative, for
it is intended to be the best estimate of what investors
would pay for a current issue of common stock of the
public utility involved. PG&W here claimed a cost of
equity in the amount of 11 percent and the complainants
proposed a range from 9.7 percent to 10 percent. In
*Lower Paxton Township, supra,* we stated that the cost
of capital should be based upon evidence of the com-
pany's recent past experience:

> "The cost of equity determination usually gives con-
> sideration to such matters as the demands for the use
> of money, the growth in earnings expected by the in-
> vestor, earnings—price ratios, dividend yields, the
> marketing cost associated with raising common equity
> capital and the earnings of comparable companies
> with similar risks." 13 Pa. Commonwealth Ct. at 143-
> 44, 317 A. 2d at 922.

We there noted, once again, that there is no magical
formula we can utilize to test the discretion of the PUC.
The PUC is required to determine the current cost for
common equity in determining fair rate of return, and

current earnings-price ratios are representative of such costs. *Pennsylvania Public Utility Commission v. Peoples Natural Gas Company*, 35 Pa. P.U.C. 61, 84-85 (1957). The PUC considered earnings-price ratios in this case, as well as other factors. We have read the record and conclude 'that there is evidence to support the Commission's use of 10.9 percent as the cost of equity capital.

### B. Cost of Preferred Stock Capital

The PUC found 4.59 percent as the proper cost of PG&W's preferred stock capital for rate-making purposes. This was the actual cost after giving effect to a bond repurchase discount (without the discount, the actual cost was over 6 percent). It is interesting to note that the record reveals that the expert rate-of-return witnesses for both PG&W and the complainants adjusted this cost of preferred stock capital to reflect the estimated cost of a projected six-million dollar preferred stock issuance, which increased the cost of preferred stock from 4.59 to 5.72 percent and 5.96 percent (this last percentage having been recommended by the complainants' witness). The PUC did not give any recognition to the proposed increased cost in their determination of the fair rate of return, in spite of the fact that it stated in its adjudication that ". . . this Commission has followed the policy of permitting, in the allowed rate of return, the weighting of new capital cost incurred following the end of test year, but known before the termination of the rate proceedings." While this would appear to be a reversible inconsistency which lowered the fair rate of return, in reality it was harmless error because of what the PUC did in its determination of the cost of debt capital, as follows:

### C. Cost of Debt Capital

The Commission found that the cost of debt capital was 5.9 percent, after reflecting bond repurchase dis-

counts. The expert rate of return witnesses for both PG&W and the complainants recommended an embedded cost of long-term debt at 5.82 percent and 5.86 percent respectively. While a first reading of the adjudication would seem to indicate that the PUC allowed a higher cost of debt capital than either of the experts recommended, still there is evidence in the record which would indicate that the PUC utilized the actual cost of the long-term debt as 5.97 percent, and adjusted this figure for bond repurchase discounts and arrived at a 5.9 percent judgment figure. While we might question the PUC's use of the 5.9 percent figure in the face of the recommendations found in the expert testimony, insofar as the cost of debt capital is concerned, we do not deem this to be reversible error, in light of the fact that the PUC ignored the increased cost of preferred stock (as noted above) which these same expert witnesses both estimated and took into account in their recommended figures for preferred stock capital.

A public utility is entitled to an opportunity to earn a fair rate of return. *Riverton Consolidated Water Company v. Pennsylvania Public Utility Commission,* 186 Pa. Superior Ct. 1, 140 A. 2d 114 (1958); *Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 126 A. 2d 777 (1956). Our appellate courts have stated on many occasions that the following factors, if shown by the evidence, may be considered in determining fair rate of return: (1) the amount necessary to assure confidence in the financial structure of the company and maintain its credit standing; (2) the payment of dividends and interest; (3) the amount of the investment, the size and nature of the utility, its risks, and the circumstances attending its origin, development and operation; and (4) the financial structure, the credit standing, dividend, interest, and attendant risks, regulatory lag and wasting assets. *See Riverton Consolidated Water Company, supra; Pittsburgh v. Pennsyl-*

*vania Public Utility Commission,* 182 Pa. Superior Ct. 376, 126 A. 2d 777 (1956); and *Wall v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 35, 125 A. 2d 630 (1956). Although cost of capital and fair rate of return are not always synonymous, cost of capital "is certainly one of the most important bases upon which a fair rate of return is determined." *Lower Paxton Township, supra.* In *Lower Paxton Township,* we also noted that "[b]ecause of these many variables, the cost of capital is basically a matter of judgment governed by the evidence presented and the regulatory agency's expertise." 13 Pa. Commonwealth Ct. at 141, 317 A. 2d at 921. The PUC's judgment must be accepted unless without support in the record, based upon error of law or unconstitutional. *Lower Paxton Township, supra.* Our review of this entire complicated record permits us to conclude that there is sufficient substantial evidence to support the PUC's final determination pertaining to fair rate of return.

## IV. CLAIMED LOSS DURING SUSPENSION

As is set forth at the beginning of this opinion, the proposed rates filed by PG&W were postponed several times, and by order dated March 14, 1974, the rates which were then in effect were prescribed as temporary rates pending the final determination of this matter. By virtue of the Commission's final adjudication, dated July 9, 1974, there was disallowed $628,318 of the $2,656,420 originally requested by PG&W and not collected under the temporary rates. In the final order PG&W was ordered to file new supplements to its tariffs containing acceptable rates to provide a total annual revenue of $13,491,929. These new rates were to become effective from July 9, 1974, or from within 30 days thereafter, at the election of PG&W. It was also ordered that the public authorities and public fire protection customers, which had not been included in the proposed increase,

were to be included with the same overall percentage increase as all other customers, the increase to be effective for these customers from August 1, 1974. The Commission further permitted the filing of supplements to its tariff so as to permit a recoupment of revenues from its customers under the allowable rates for sales on and after March 15, 1974. PG&W argues that by virtue of this order it is not permitted to earn the 7.35 percent fair rate of return on its property used and useful in public service from January 30, 1973 (the date the company filed its rate increase) to March 15, 1974. In its brief, it calculated that loss to be $2,720,878, which it characterizes as a total loss resulting from regulatory lag.

Section 308 of the Act, 66 P.S. §1148, sets forth the power of the PUC to suspend proposed rate increases. Subsection (a) states that no public utility may make any change in its rates except after 60 days' notice. Subsection (b) states:

"(b)   Whenever there is filed with the commission by any public utility any tariff stating a new rate, the commission may, either upon complaint or upon its own motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate, and pending such hearing and the decision thereon, the commission, upon filing with such tariff and delivering to the public utility affected thereby a statement in writing of its reasons therefor, *may,* at any time before it becomes effective, suspend the operation of such rate for a period not longer than six months from the time such rate would otherwise become effective, and an additional period of not more than three months pending such decision. The rate in force when the tariff stating the new rate was filed shall continue in force during the period of suspension, unless the commission shall establish a temporary rate as authorized in section three hundred ten of this act. The commission shall consider the effect of such suspen-

sion in finally determining and prescribing the rates to be thereafter charged and collected by such public utility." (Footnote omitted.) (Emphasis added.) Under section 310 of the Act, 66 P.S. §1150, we find provisions whereby temporary rates fixed in accordance with the above provision shall be sufficient to provide a return of not less than 5 percent upon the original cost, less accrued depreciation of the physical property. Section 310 concludes with the following language:

"(e)   Temporary rates so fixed, determined, and prescribed under this section shall be effective until the final determination of the rate proceeding, unless terminated sooner by the commission. In every proceeding in which temporary rates are fixed, determined, and prescribed under this section, the commission *shall* consider the effect of such rates in fixing, determining, and prescribing rates to be thereafter demanded or received by such public utility on final determination of the rate proceeding. If, upon final disposition of the issues involved in such proceeding, the rates as finally determined, are in excess of the rates prescribed in such temporary order, then such public utility shall be permitted to amortize and recover, by means of a temporary increase over and above the rates finally determined, such sum as shall represent the difference between the gross income obtained from the rates prescribed in such temporary order and the gross income which would have been obtained under the rates finally determined *if applied during the period such temporary order was in effect.*" (Emphasis added.)

We agree with PG&W that the PUC has a duty to make allowance for the loss suffered by a public utility whose rate requests are suspended for the full statutory period and later sustained by an adjudication. In *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 217, 90 A. 2d 607, 621

(1952), the Court stated that it is presumed that the Commission has considered the effect of the suspension and, therefore, the burden is upon the public utility to prove the contrary. PG&W has not met this burden, and, further, under the facts of this case, we cannot hold that the PUC acted in an arbitarary or capricious manner. First of all, the PUC permitted approximately one-half of the proposed rate increase to take effect at the end of the 60-day period (plus 12 days during which the effective date was voluntarily postponed). PG&W, therefore, collected half of the total increase during the entire period from April 12, 1973. Another fact which militates against PG&W's contention is that prior to the end of the nine-month suspension period, PG&W voluntarily postponed the effective date to March 15, 1974. On that date, the then effective rates became temporary rates by order of the Commission dated March 14, 1974. We have a difficult time understanding the argument of PG&W that the PUC acted in an arbitrary manner in suspending these rates to March 15, 1974, when PG&W voluntarily permitted such suspension. In reaching the conclusion that the PUC did not abuse its discretion or commit an error of law in not permitting a recoupment for the period prior to March 15, 1974, we want to make clear that under our reading of the Act we believe it would be an error of law for the Commission to ignore or refuse to give consideration to the effect of any suspension beyond 60 days from the date of filing. However, when a public utility voluntarily permits a suspension of rates beyond the statutory power of the PUC, the PUC has permitted part of those rates to be collected during the entire period, and the PUC permits a recoupment back to the date on which it established temporary rates, no error of law has been committed. Notwithstanding this, we must point out that any failure by the PUC to recognize the effect of the suspension period not only creates the possibility of the confiscation of the utility's property,

but could create a situation whereby utilities would be forced into filing rate increases on a monthly basis so as to protect their stockholders. The thought of any such happening (which is certainly conceivable in this day of the computer printout) would be contrary to what we perceive to be the legislative intent, i.e., reasonable regulation so as to protect both the public and the public utility.

## V. PG&W's RIGHT TO APPEAL

The PUC contends that by virtue of the fact that PG&W was disallowed only $628,318 out of a total request of $4,870,103, it should be denied its right to appeal. This argument is totally without merit, especially in view of our discussion of the important issues raised by both PG&W and the complainants in this case. The cases cited by the PUC with respect to PG&W's right to appeal are totally inapposite.

## VI. SUMMARY

In summary, we hold that the PUC committed an error of law in excluding the $2,558,643 payment for damages by PennDOT to PG&W for property taken, whether those damages were determined on the valuation of property taken before and after the condemnation, or whether determined by the "cost-to-cure" basis, where the money received was invested in plant used and useful in the public service. The PUC will be directed upon remand to include the amount it excluded from both the net original cost, valuation figures and any other trended original cost statistics needed to arrive at a fair value figure. Annual depreciation likewise will have to be adjusted to include an amount appropriate for the property which this PennDOT money purchased. Our review of this long record permits us to conclude that there is sufficient substantial evidence to support all of the Commission's finding on fair value with, of course, the exception of the PennDOT payment problem mentioned above.

Likewise, there is sufficient substantial evidence to support the final determination of the Commission on rate of return. While we recognize that the PUC must give consideration to any losses incurred by the public utility during any suspension period beyond the 60-day filing period requirement. PG&W did not prove that the PUC did not give such consideration, especially in the light of the fact that the PUC suspended only part of the increased rates filed.

In closing, we should take note that under the cost of service accounting methods used by all utility regulatory bodies, any time a public utility realizes a rate increase, government itself receives an increase in tax revenues. This should not be overlooked. In this day when all citizens are feeling the terrible pinch of spiraling inflation, public utility bills seem to be increasing with each receipt of a bill for the past month's service. We believe it to be of great importance to highlight the fact that government receives a windfall from public utility rate increases through increased tax revenues. In this case, for instance, as a result of the Commission's adjudication, PG&W was entitled to file supplements to its tariff so as to permit it to recover annual operating revenues of $13,491,929. Of that amount, over $2,800,000 or about 20 percent will be paid to the federal, state, and local governments. We have included here the $373,284 for the public utility realty tax (part of which will be received by the local municipalities in the service area of PG&W) and $124,200 for capital stock tax, both of which are paid by PG&W's customers through the state tax adjustment surcharge. In reality PG&W is forced to become a tax collector for government to recover what may be deemed to be hidden taxes which the consumers do not realize they are paying. In this case, of the approximately four and a half million dollar rate increase, almost one million dollars represents increased taxes which the consumers must pay. Perhaps it is time to take another look at indirect taxation through consumers of public utilities.

While some may advocate that there should be no taxes on public utilities, we take no position. That is a legislative matter entirely.

Because of the tone of the dissenting opinion of one of the PUC commissioners in this case, we feel constrained to add a few additional words on the role of the PUC Commissioners, their counsel and intervenors (or "consumer advocates").

As this opinion is written, this Court has before it several cases where government attorneys, often characterized as "consumer advocates," are opposing public utility rate increases. As we read the law, and as we have stated in another case involving another regulatory agency, any person who finds himself in a *judicial* or *quasi-judicial* position with the responsibility of passing upon the rights of fellow citizens, should be an advocate of nothing except justice. *Nationwide Mutual Insurance Company v. Commonwealth of Pennsylvania,* 15 Pa. Commonwealth Ct. 24, 42, 324 A. 2d 878, 886 (1974).

The duty of a PUC commissioner is to carry out the legislative intent, a part of which is for the PUC to establish rates which are as equally fair, just and reasonable as possible to the consumer, the public utility and the public. Any partiality by a commissioner in any direction is a violation of the law and reversible error. While the courts grant wide latitude in the area of regulatory discretion, courts may not approve any unreasonable, arbitrary or capricious acts which result in an abuse of that discretion. Counsel for the PUC has a duty to assist the PUC in carrying out its duty to comply with the legislative intent. Obviously, where there is no one representing the consumers in a given public utility rate case, what may be deemed to be an additional responsibility falls upon counsel for the PUC (and also the staff of the PUC) to make certain that the interests of the consumers are fully protected. Whether or not this can be categorized as the position of "consumer advocate" is a matter of degree, for even here, as we perceive counsel's duties, if

counsel goes beyond the bounds of the legislative intent, counsel acts improperly. On appeal, counsel has a duty to represent the PUC and support its adjudication; counsel may not take an independent position. *See York v. Public Utility Commission,* 3 Pa. Commonwealth Ct. 270, 281 A. 2d 261 (1971) *aff'd.* 449 Pa. 136, 295 A. 2d 825 (1972) and *Liquor Control Board v. Kusic,* 7 Pa. Commonwealth Ct. 274, 299 A. 2d 53 (1972). There is a practical need for a "consumer's advocate" in these complicated cases, and the statute permits such intervention. Whether "consumer advocates" are specially authorized statewide (as now appears to be an accomplished fact in this state), or appear through specific intervention (as the solicitors for the complainants did in this case), their sole duty obviously is to protect the interests of the consumers or the public, and to highlight any errors made by either the PUC or the public utility, within the framework of the law. Even where "consumer advocates" intervene, counsel for the PUC has the same duty to carry out the legislative intent to equally protect the consumers, the public utility, and the public. We hope that these additional thoughts will clear the air on the various roles of the parties involved.

## ORDER

AND NOW, this 27th day of May, 1975, based upon the above opinion, the motion of Pennsylvania Gas and Water Company to dismiss the petition to intervene filed by the Carbondale Area School District is hereby granted; and it is ordered that this entire matter be remanded to the Pennsylvania Public Utility Commission for the purpose of amending its adjudication dated July 9, 1974, so as to amend its rate-based calculations, both for net original cost and fair value, by including the appropriate amount of money representing the payment by the Pennsylvania Department of Transportation to Pennsylvania Gas and Water Company under the agreement dated October 21, 1969, to amend its findings with regard to annual depre-

ciation to be allowed on the said property involved in the rate-base adjustment mentioned immediately hereinbefore, and to make any other cost of service adjustments which may be necessary as a result thereof and not inconsistent with anything set forth in the above opinion; and it is also ordered that Pennsylvania Gas and Water Company shall be permitted to file supplements to its various tariffs affected hereby so as to recover the total amount of revenue permitted by the Pennsylvania Public Utility Commission under its adjudication dated July 9, 1974, as adjusted by virtue of this order, so that increased rates may be recovered from its customers from March 15, 1974 and to permit the collection of increased rates from the public authorities and public fire protection customers as ordered in the Pennsylvania Public Utility Commission's order of July 9, 1974; and it is further ordered that, to the extent the order of the Pennsylvania Public Utility Commission, dated July 9, 1974, is inconsistent herewith, it is reversed; and insofar as it is not inconsistent herewith, it is affirmed.

Judge WILKINSON concurs in the result only.

---

DISSENTING OPINION BY JUDGE BLATT:

For the reasons set forth in my dissenting opinion in *Keystone Water Company, White Deer District v. Pennsylvania Public Utility Commission,* 19 Pa. Commonwealth Ct. 292, 339 A.2d 873 (1975). I must respectfully dissent to that portion of the majority opinion which holds that the Public Utility Commission improperly excluded from the rate base that amount of the condemnation award paid by the Pennsylvania Department of Transportation, to provide that functional substitute would be constructed to insure the continued availability of a water supply to the affected consumers of the Pennsylvania Gas and Water Company. I believe that such exclusions are both constitutional and just and reasonable under the laws of the Commonwealth.