West Penn Power Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued September 11, 1979, before President Judge BOWMAN and Judges WILKINSON, JR., ROGERS, BLATT, DISALLE, CRAIG and MACPHAIL. Judges CRUM-LISH, JR. and MENCER did not participate.

*W. Russel Hoerner,* with him *Vincent Butler, Morgan, Lewis & Bockius,* and *Franklin L. Morgal,* for petitioner.

*William T. Hawke,* Assistant Counsel, with him *Patrick D. Ward,* Assistant Counsel, *Daniel F. Joella,* Deputy Chief Counsel, and *George M. Kashi,* Chief Counsel, for respondent.

OPINION BY JUDGE BLATT, March 20, 1980:

The West Penn Power Company (West Penn) appeals here from an order of the Public Utility Commission (PUC) which denied its request for a rate increase.

On September 29, 1976, West Penn filed with the PUC two tariff supplements which proposed to increase its rates so as to produce additional annual revenues of $47,220,718, with its proposal based on an experienced test year which ended June 30, 1976. On December 21, 1976, the PUC ordered that the proposed increase be suspended and an investigation be conducted to determine the reasonableness of the request, and at the same time, it allowed West Penn to file a tariff supplement designed to produce, on a temporary basis, additional annual revenues not in excess of $11,-000,000. After hearings and argument, the PUC ultimately adopted a final order which directed West Penn to file tariff supplements which would increase annual revenues by $10,624,011, which is $35,596,707 less than West Penn sought.

In its appeal to us, West Penn argues that the PUC made improper determinations with regard to fair value, fair rate of return, operating revenues, and operating expenses. It also alleges confiscation, an issue

which we need not decide inasmuch as we are remanding the case to the PUC for further consideration. *See Equitable Gas Co. v. Pennsylvania Public Utility Commission,* ___ Pa. Commonwealth Ct. ___, 405 A.2d 1055 (1979).

## FAIR VALUE

West Penn maintains a generating facility known as the Mitchell Generating Station, and this facility has three generating units, two of which are oil-fired and one of which (Mitchell No. 3) is coal-fired. Apparently most of the output of the Mitchell facility during the test year had been from the more economically operated Mitchell No. 3. In 1977, however, the United States Government forced the closing of Mitchell No. 3 because of problems in complying with federal environmental regulations. Although this event occurred after the conclusion of the test year, the PUC took notice of the closing in its determination of the fair value of West Penn's "used and useful" property, reasoning as follows:

> The unit is not now entirely used and useful for current ratepayers. Under these circumstances ratepayers should not be required to pay West Penn a full return on this property. We believe that an appropriate treatment would be to allow a return of the investment in the plant by leaving it in the original cost of the rate base. However, we will reduce the return on investment by eliminating this unit from the present value measure of the five-year average price level. While there might well be other means of accomplishing the same result, this procedure is reasonable.

West Penn argues now that the PUC improperly excluded Mitchell No. 3 and its fuel inventory from the five-year average price level because West Penn might

resolve the present environmental difficulties and put the unit back into operation and because the closing occurred more than fifteen months after the end of the test year and no reference to the closing is made in the record. We must agree that the PUC's consideration of the closing of Mitchell No. 3 warrants our remanding this matter.

In *Duquesne Light Co. v. Pennsylvania Public Utility Commission*, 176 Pa. Superior Ct. 568, 587-88, 107 A.2d 745, 754 (1954), our Superior Court discussed the effect of changes occurring after the test year but before the PUC's final order:

> We recognize that, in practical application, the use of a test year and cut-off date in determining a rate case is not free from difficulty, since changes may become known before the order is entered. In strict theory perhaps, these subsequent developments should be ignored. However, this court has stated that the Commission 'cannot be oblivious' to them: Pittsburgh v. Pa. P.U.C., 171 Pa. Superior Ct. 187, 90 A.2d 607. It must be kept in mind that rates are being fixed for the future, and the Commission, having 'a wide area of discretion as to the extent and the type of adjustments to be made to base year figures': Pittsburgh v. Pa. P.U.C., supra, 174 Pa. Superior Ct. 62, 99 A.2d 61, could properly make an adjustment to reflect [subsequent changes].

It is clear, therefore, that the PUC can consider events which occur after the end of the test year. We believe, moreover, that the PUC was entitled to take official notice of its previous order allowing the discontinuance of the operation of Mitchell No. 3. However, as we have previously noted:

> Before an administrative agency in an adjudication can base its findings on information

contained in the records of other cases decided
by itself, it must appear on the record that no-
tice was given to the parties of record that the
adjudicating body is considering specified in-
formation. . . . Only in this way can a party's
fundamental due process rights of notice and an
opportunity to be heard be protected.

*City of Erie v. Pennsylvania Public Utility Commis-
sion,* 41 Pa. Commonwealth Ct. 194, 197, 398 A.2d 1084,
1086 (1979). No such notice appears in the record be-
fore us because, in fact, the record was closed before
the PUC's order allowing discontinuance of Mitchell
No. 3. Accordingly, while there is no question that Mit-
chell No. 3 is closed, and West Penn concedes as much
in its brief, we must conclude that West Penn was
denied its right to know that the PUC was considering
the results of another proceeding. We must therefore
remand to the PUC on this issue, and thereby give
West Penn a chance to present its position as to what
effect the closing of Mitchell No. 3 should have.

As to the PUC's treatment of Mitchell No. 3 in its
computation of fair value, we note that fair value in-
cludes the "property rightfully belonging to a utility
company which is used and useful in service to the
public," *Keystone Water Co. v. Pennsylvania Public
Utility Commission,* 477 Pa. 594, 605, 385 A.2d 946, 952
(1978) ; *see Scranton v. Scranton Steam Heat Co.,* 405
Pa. 397, 176 A.2d 86 (1961), and for ratemaking pur-
poses "the value [is] fixed at the time rates are es-
tablished," *Pittsburgh v. Pennsylvania Public Utility
Commission,* 370 Pa. 305, 309, 88 A.2d 59, 62 (1952) ;
*see Solar Electric Co. v. Pennsylvania Public Utility
Commission,* 137 Pa. Superior Ct. 325, 335, 9 A.2d 447,
456 (1939) (present fair value).

If, therefore, Mitchell No. 3 was not at the time of
rate determination, and is not now, used and useful,

and no one knows when it will be, the PUC has no obligation to include it in its determination of fair value at all. *Cf. Bell Telephone Co. v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 614, 408 A.2d 917 (1979) (Construction work in progress does not constitute used and useful property). In fact, however, it included Mitchell No. 3 in its original cost figure but eliminated it from the five-year average price level, giving West Penn some, but not full, return on the unit. This appears to us to have been a liberal compromise, and, while we might or might not endorse this particular approach, we are unable to conclude that the PUC abused its discretion in adopting it.

West Penn also argues that the method by which the PUC arrived at the fair value figure of $838,300,-130 was improper. This figure was reached by weighting the original cost ($754,111,090) at 65 percent and the five-year average cost ($994,651,250) at 35 percent. These figures represent, respectively, the debt and preferred stock component of the capital structure (65 percent) and the common equity component (35 percent). West Penn challenges the PUC's weighting and its use of the five-year average price levels rather than the trended original price levels at June 30, 1976.

While this Court has previously disapproved such a weighting formula which corresponds to a utility's capital structure, *Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water Co.*, 19 Pa. Commonwealth Ct. 214, 230, 341 A.2d 239, 249 (1975), *rev'd on other grounds,* Pa. , A.2d (1980), we are unwilling to hold that such a formula is per se improper. In this particular case, moreover, we are not convinced that the PUC abused its discretion in using this formula, for as we also stated in *Pennsylvania Gas & Water Co., supra,* 19 Pa. Commonwealth Ct. at 228, 341 A.2d at 248, "The fair value figure represents

a judgment to be made by the PUC within its discretion, and there is no magical mathematical formula to which the PUC is bound in determining fair value.'' The PUC reasoned here that it was appropriate to consider the nature of the utility's capital structure in order to reflect more accurately the effects of inflation:

> Inflation has no direct effect on debt holders because they are compensated in the form of interest. The fixed contractual returns to these investors are properly measured in terms of the original cost of such investment. The same is true with the holders of preferred stock. These security holders have a contractual relationship and receive a specific dollar return for their investment.

And, although there may be *potential* for abuse in such a formula, we are unable to conclude that the weighting done here was unreasonable. Nor can we conclude, despite our contrary position in *Pennsylvania Gas & Water Co.*, 19 Pa. Commonwealth Ct. at 230, 341 A.2d at 249, that the use of such a formula requires that the PUC use current price levels rather than a five-year average. Such a ruling would constitute inflexible restraint on the PUC's discretion and could, as the PUC suggests, result in distortions because of unusual occurrences affecting current or single-year prices.

In conclusion, we believe that, as to fair value, the PUC erred only in failing to inform West Penn that it was considering its previous order closing Mitchell No. 3.

### Fair Rate of Return

West Penn also argues that the PUC erred in fixing a fair rate of return at 8.38 percent. The Commission's determination was as follows:

|                 | Capital Structure | Cost Rate | Weighted Cost |
|-----------------|-------------------|-----------|---------------|
| Debt            | 52%               | 6.73%     | 3.50%         |
| Preferred Stock | 13%               | 6.58%     | 0.86%         |
| Common Equity   | 35%               | 11.50%    | 4.02%         |
|                 | 100%              |           | 8.38%         |

West Penn disputes the PUC figure of 11.50 percent as the cost rate for common equity, proposing instead the figure offered by its expert, 12.50 percent, which would allow a return of 8.75 percent. It argues that, whereas its figure is supported by the evidence and testimony of its expert, the PUC's figure is not based on any evidence and is arbitrary. We agree and note that we have previously reversed the PUC where it made a similar downward adjustment without any supporting evidence or reasoning. See *U.S. Steel Corp. v. Pennsylvania Public Utility Commission*, 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978). See also *Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission*, 38 Pa. Commonwealth Ct. 614, 394 A.2d 1063 (1978). We must therefore remand this aspect of the case to the PUC for a finding as to the cost of common equity which is supported by the record and explained in its adjudication. See *Equitable Gas Co. v. Pennsylvania Public Utility Commission, supra.*

OPERATING REVENUES AND EXPENSES

West Penn argues further that the PUC erred in deleting Mitchell No. 3 from its determination of fair value but assuming the continued availability of the facility in its determination of West Penn's operating revenues and expenses. This, West Penn argues, is inconsistent and fails to take into account the increased cost of an alternative source of power to re-

place that lost from Mitchell No. 3. We can find no consideration or recognition of this problem in the PUC's adjudication, and therefore, we must also remand this aspect of the case for the PUC's consideration as to what effect, if any, the unavailability of Mitchell No. 3 has on West Penn's revenues and expenses.

Finally, West Penn asserts that the PUC erred in reducing its operating expenses by $241,000, the amount of a credit balance which West Penn had at the end of the test year. This credit balance existed in a "suspense" account which West Penn used to keep track of power delivered to and received from nonaffiliated electric utilities. The suspense account is summarized as follows:

|  | Megawatthours | Amount |
|---|---|---|
| Suspense Account: |  |  |
| Purchases | 165,659 | $1,973,093 |
| Deliveries | (178,419) | 1,732,582 |
|  | 12,760 | $ 240,511 |

The PUC thought it necessary to balance the account because

> normally [West Penn] delivers electrical energy in the months of June, July and August to [another utility] and receives a like amount of energy in the following December, January and February. But in this case the selected test year split one of the two matching three-month periods.

Therefore, the account showed greater purchases than deliveries, resulting in a distortion of the test year. The PUC corrected this distortion by reducing operating expenses by $241,000. West Penn attacks this procedure as unsound accounting. We think, however,

174

that the application of accounting principles is within the discretion and competence of the PUC, and in the absence of a manifest abuse, which does not exist here, we are unwilling to interfere with its judgment.

CONCLUSION

For the reasons stated above, we shall remand this case to the PUC for further consideration of its findings consistent with our opinion herein.

ORDER

AND Now, this 20th day of March, 1980, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is hereby set aside and the record is remanded for further consideration and findings consistent with our opinion herein. The PUC may receive any such additional evidence as the circumstances require and, upon making proper findings, shall revise and modify its order as necessary.

President Judge BOWMAN did not participate in the decision in this case.

Judge DISALLE did not participate in the decision in this case.