PENNSYLVANIA BANKERS ASSO-
CIATION and the Pennsylvania
Business Bank, Petitioners

v.

PENNSYLVANIA DEPARTMENT OF
BANKING and TruMark Financial
Credit Union, Respondents

Pennsylvania Bankers Association,
Pennsylvania Business Bank, Fulton
Bank, and Premier Bank, Petitioners

v.

Pennsylvania Department of Banking,
Pennsylvania Department of Revenue,
The Attorney General of the Common-
wealth, and Freedom Credit Union,
Respondents

Pennsylvania Bankers Association and
the Pennsylvania Business Bank,
Petitioners

v.

Pennsylvania Department of
Banking, Respondent.

Commonwealth Court of Pennsylvania.

Argued June 10, 2009.

Decided Sept. 28, 2009.

Raymond P. Pepe, Harrisburg, for petitioner, Pennsylvania Bankers Association.

Linda Carroll, Deputy Chief Counsel, Harrisburg, for respondent, Department of Banking.

Francis Crowley, Philadelphia, for respondent, Freedom Credit Union.

Daniel T. Fitch, Philadelphia, for respondent, Trumark Financial Credit Union.

BEFORE: SIMPSON, Judge, and FRIEDMAN, Senior Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge SIMPSON.

## TABLE OF CONTENTS

I. Statutory History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 979

II. Factual and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 980
 A. Historical Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 980

 B. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 981
 1. Department Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 981
 2. Commonwealth Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 982
 a. Current Appellate Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 982

 b. Original Jurisdiction Proceedings ................................ 983
 c. Related Appellate Proceedings ................................... 984

III. Current Appeal ......................................................... 984
 A. Well-Defined Local Community ...................................... 985
 1. NCUA Manual ................................................ 985
 2. Metropolitan Statistical Area ................................... 986
 3. Sharing of Interest and Interaction ............................ 987
 4. Region v. Local Community ..................................... 991

 B. Compliance with Statutory Law ...................................... 992
 1. Banking Code of 1965 and Department of Banking Code ................ 992
 2. Statutory Construction Act ..................................... 993
 3. Credit Union Code ............................................ 994

 C. Official Notice ................................................... 995

 D. Due Process ..................................................... 996
 1. Non-Disclosure Provision ...................................... 996
 2. *Conestoga* ................................................. 997
 3. Developments since *Conestoga* ................................ 997
 4. Discussion ................................................... 998
 a. Interests Affected ......................................... 999
 b. Risk of Erroneous Deprivation ............................. 1001
 c. Government's Interest ..................................... 1002

IV. Conclusion .............................................................. 1003

V. Appendix ............................................................... 1003
 A. Order of November 10, 2008 ......................................... 1003
 B. Orders of April 15, 2009 ........................................... 1004
 C. Orders of May 11, 2009 ............................................ 1005
 D. Orders of May 21, 2009 ............................................ 1006

These consolidated cases raising questions of first impression in our appellate jurisdiction are here on remand from the Supreme Court. This is the fourth Commonwealth Court decision, and the seventh appellate court decision spawned by a complex dispute between banks and credit unions in Pennsylvania.

Here, the Pennsylvania Department of Banking (Department) permitted two state-chartered credit unions to convert their fields of membership from employer group-based to community-based, pursuant to recent amendments to the Credit Union Code, 17 Pa.C.S. §§ 101–1504. Several banks and a bankers' association appealed the orders allowing conversion.

We are generally asked whether the Department erred in allowing the conversions or denied due process.

## I. Statutory History

In a prior decision, explained below, we examined the history and purposes of credit unions. *See Pa. Bankers Ass'n v. Pa. Dep't of Banking & TruMark Fin. Credit Union*, 893 A.2d 864 (Pa.Cmwlth. 2006) (*Pa. Bankers–Appellate I*), *rev'd and remanded*, 598 Pa. 313, 956 A.2d 956 (2008)(*Pa. Bankers–Appellate II*). Since inception, Pennsylvania credit union legislation required membership based upon a common bond of association identified in the articles of incorporation.[1] In 2002,

1. *See* Section 2 of the Act of May 26, 1933, P.L. 1076, referred to as the Credit Union Act

however, the General Assembly extended the powers of credit unions by providing federal parity. A credit union may now engage in

> the activity of creating, amending or expanding its field of membership as authorized by section 109 of the Federal Credit Union Act (48 Stat. 1219, 12 U.S.C. § 1759), subject to reasonable conditions, limitations and restrictions as may be imposed by the [D]epartment, including, but not limited to, conditions, limitations and restrictions based upon safety and soundness.

17 Pa.C.S. § 501(e)(2). In turn, Section 109 of the Federal Credit Union Act provides that a community credit union, as proposed here, shall be limited to "[p]ersons or organizations within a well-defined local community, neighborhood, or rural district." 12 U.S.C. § 1759(b)(3). The Federal Credit Union Act requires the National Credit Union Administration Board (NCUA) to prescribe by regulation the definition of a "well-defined local community, neighborhood, or rural district." 12 U.S.C. § 1759(g)(1).

The NCUA promulgated rules setting forth the requirements for establishing a "well-defined local community" as follows: the geographic area's boundaries must be clearly defined; the charter applicant must show the area is a "well-defined local community, neighborhood, or rural district;" and, the residents must have common interests and/or interact. 63 Fed.Reg. 72037 (December 30, 1998). As more fully discussed below, at the heart of this matter is whether the expanded area for credit union service constitutes a "local community."

## II. Factual and Procedural History

### A. Historical Background

In 1939, employees of Bell Telephone Company founded Bell Telephone Employees Credit Union, which later became Philadelphia Federal Credit Union. After converting from a Federally-chartered credit union to a state chartered credit union, it changed its name to the Philadelphia Telco Credit Union. It now operates under the name TruMark Financial Credit Union (TruMark).

Headquartered in Bucks County, TruMark's field of membership consists of 500 select employer groups located throughout Bucks, Chester, Delaware, Montgomery and Philadelphia Counties. As discussed below, these same five counties comprise the "local community" proposed for membership conversion. TruMark maintains branch offices in Chester, Montgomery

---

of 1933, *formerly* 14 P.S. § 202, repealed by the Act of September 20, 1961, P.L. 1548 referred to as the Credit Union Act of 1961. A similar provision is now found in Sections 303 and 701(a) of the Credit Union Code, 17 Pa.C.S. §§ 303, 701(a).

Credit unions originated in mid–19th century Europe as cooperative associations that were intended to provide credit to persons of small means; they were usually organized around some common theme, either geographic or associational. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 493, 118 S.Ct. 927, 140 L.Ed.2d 1, n. 6 (1988) (citations omitted). Following the European example, in the 1920's many states passed statutes authorizing the chartering of credit unions, and a number of those statutes contained provisions requiring a common bond for membership. *Id.* (citations omitted).

During the Great Depression, in contrast to widespread bank failures, there were no involuntary liquidations of state-chartered credit unions. Id. (citations omitted). The cooperative nature of the institutions, which state law common bond provisions reinforced, was believed to have contributed to this result. *Id.* (citations omitted). A common bond provision was included in the District of Columbia Credit Union Act passed by Congress in 1932, and an identical provision was included in the Federal Credit Union Act passed by Congress in 1934. *Id.* (citations omitted).

and Philadelphia Counties, and it employs 200 people to serve 76,491 members. Its assets total $760 million.

In November 2003, TruMark filed with the Department an application for charter conversion to serve a community field of membership (Conversion Notice). The amendment to TruMark's articles of incorporation would allow TruMark to convert its field of membership from employer-based memberships to geographic, or community, based memberships. In particular, TruMark sought to convert its field of membership to persons who live, work, worship, or attend school and businesses and other legal entities in Bucks, Chester, Delaware, Montgomery and Philadelphia Counties (proposed community). The Department published notice of TruMark's Conversion Notice in the Pennsylvania Bulletin.

Freedom Credit Union (Freedom) was established in 1934 as the Philadelphia Teachers' Credit Union. Throughout the years, Freedom's field of membership grew to include Delaware and Montgomery County teachers as well as administrative and teaching employees of universities, colleges and tax-supported schools. It employs 82 people, and its current field of membership includes 173 select employer groups. Freedom's assets total $265 million. It maintains branch offices in Bucks, Montgomery, and Philadelphia Counties.

In October 2003, Freedom submitted to the Department a community charter application (collectively, Conversion Notices). It sought to convert its field of membership from employer-based memberships to a community field of membership consisting of persons who live, work, worship, perform volunteer services, attend school, or participate in associations headquartered in, and businesses and other legal entities located in the same five counties proposed in TruMark's Conversion Notice as well as in the New Jersey Counties of Burlington, Camden, and Gloucester. The Department published notice of Freedom's Conversion Notice in the Pennsylvania Bulletin.

## B. Procedural Background

### 1. Department Proceedings

After publication of the Conversion Notices, the Pennsylvania Bankers Association and the Pennsylvania Business Bank (collectively, Banks) petitioned to intervene in TruMark's and Freedom's (collectively, Credit Unions) conversion proceedings. In addition, several banking institutions petitioned to intervene in Freedom's Conversion Notice, namely, Fulton Bank, Premier Bank, and Lafayette Ambassador Bank.[2]

In response to Banks' petitions to intervene, the Department issued an order appointing a Presiding Officer to preside over hearings on the Conversion Notices. The Secretary reserved the right to enter a final decision without a recommendation from the Presiding Officer. Reproduced Record (R.R. at 719a). The Department

---

**2.** Two New Jersey corporations also intervened in Freedom's conversion proceedings to challenge the Department's jurisdiction and Freedom's expansion into New Jersey. The Department disapproved Freedom's Conversion Notice with respect to the New Jersey Counties. Freedom did not appeal that determination.

Additionally, Corry–Jamestown Credit Union sought to convert its field of membership to a community-based membership consisting of a 35–mile radius around Corry, Pennsylvania. Northwest Savings Bank intervened in Corry–Jamestown's conversion proceedings. Although the Department held consolidated hearings on all the conversion notices, the outcome of the Corry–Jamestown conversion notice is not considered in this appeal.

expressly provided that the General Rules of Administrative Practice and Procedure, 1 Pa.Code §§ 33.1–35.251, applied to the proceedings. The Department also granted Banks intervenor status pursuant to 1 Pa.Code § 35.31(b).

Early in the proceedings, the Presiding Officer was confronted with a discovery issue: whether Banks were entitled to complete copies of the Credit Unions' Conversion Notices, which included proprietary information such as business plans and marketing plans. For reasons more fully discussed below, the Presiding Officer did not grant Banks unfettered access to Credit Unions' Conversion Notices. Instead, the Presiding Officer ordered Credit Unions to turn over those portions of their Conversion Notices to which they voluntarily agreed as well as any other public documents appended to their Notices (Disclosure Order). The Presiding Officer's order gives rise to the due process issue in the current appeal.

The Presiding Officer held three days of hearings. The evidence focused on whether the proposed five-county area constitutes a "well-defined local community" as that term appears in the NCUA's 2003 Chartering and Field of Membership Manual (Manual). In support of their Conversion Notices, Credit Unions offered the testimony of Dennis Dollar, former chairman of the NCUA, and Richard Stein, president of Klios, Inc., an economic consulting firm. Credit Unions also offered the testimony of their respective chief executive officers. For their part, Banks offered the testimony of Pete Leggett, a senior economist for the American Bankers' Association; Christopher McKenna, an expert in management science and op-

erations research; and Michael Young, an urban and regional planner. Banks also offered the deposition of John Spier, a consultant for National Penn Bank who was qualified as an expert in the areas of marketing and business plans; resources necessary to implement said plans; and Credit Unions' ability to operate in a manner consistent with safety and soundness.

On December 22, 2004, the Department entered two final orders. The first order approved TruMark's Conversion Notice. The Department determined TruMark met its burden of proving the proposed community constitutes a "well-defined local community" consistent with the NCUA Manual. The Department also concluded Banks failed to prove they would be adversely affected by TruMark's charter conversion.

The second order addressed Freedom's application. The Department concluded that Freedom met its burden with respect to the five Pennsylvania counties identified in its Conversion Notice but not as to the three New Jersey counties. Accordingly, the Secretary remanded the matter for consideration of whether Freedom possesses the necessary resources to serve the proposed community in a manner consistent with the safety and soundness of a credit union and for the imposition of conditions, limitations and restrictions. Also, the order dismissed Banks as intervenors on the basis they failed to prove their property interests would be adversely impacted by Freedom's charter conversion.

### 2. Commonwealth Court Proceedings

#### a. Current Appellate Proceedings

Banks timely petitioned for review of the Department's orders.[3] Speaking

---

**3.** The matter docketed at 42 M.D.2005 implicated both this Court's original and appellate jurisdiction with regard to the TruMark conversion. The matter docketed at 98 M.D.2005

implicated both this Court's original and appellate jurisdiction with regard to the Freedom conversion. The matter docketed at 157 C.D.2005 was addressed to this Court's appel-

through your current author, an *en banc* panel of this Court discerned no error in the Department's dismissal of Banks as intervenors. *See Pa. Bankers–Appellate I.* We did not address Banks' substantive claims.

On further appeal, a divided Supreme Court reversed. *Pa. Bankers–Appellate II.* Banks, the Court majority concluded, continued to have standing as a public interest party.[4] In particular, the Court declared the Department erroneously revoked Banks' standing after allowing intervention pursuant to 1 Pa.Code § 35.31(b) without qualification and an indication it required additional evidence on standing. Accordingly, the Supreme Court reinstated Banks as parties and remanded the matter to this Court for resolution of Banks' remaining claims.

### b. Original Jurisdiction Proceedings

In conjunction with their appeal from the Department's December 2004 orders approving Credit Unions' Conversion Notices, Banks filed a declaratory judgment action in our original jurisdiction seeking a declaration that certain provisions of the Credit Union Code are unconstitutional. Opposing parties filed preliminary objections, alleging Banks lacked standing to bring a declaratory judgment action. Opposing parties also demurred to Banks' constitutional challenges.

Again speaking through your current author, an *en banc* panel of the Court sustained the preliminary objections in part and overruled them in part. *See Pa. Bankers Ass'n v. Pa. Dep't of Banking,* 893 A.2d 864 (Pa.Cmwlth.2006) (memoran-

dum opinion on issues in original jurisdiction) (*Pa. Bankers–Original I* ), *appeal quashed,* 597 Pa. 1, 948 A.2d 790 (2008)(*Pa. Bankers–Original–II*). Summarizing, we found Banks sufficiently pled standing in order to challenge the constitutionality of certain provisions of the Credit Union Code, although we put Banks on notice that they would need to prove the facts pled. Slip Op. at 8–9. We likewise overruled a demurrer to Banks' equal protection and uniformity of taxation claims. However, we sustained a demurrer to Banks' claims the Credit Union Code's exemption from taxation provisions are unconstitutional. We also determined Banks failed to sufficiently plead that the Credit Union Code violates the constitutional provision governing taxation of corporations. In the end, Banks' uniformity of taxation and equal protection claims remained. We then directed Banks to file a responsive pleading within the prescribed time.

Banks appealed our order disposing of the preliminary objections, and upon application, the original jurisdiction proceedings were stayed. The Supreme Court subsequently quashed Banks' appeal as interlocutory. *Pa.Bankers–Original II.*

Thereafter, we dissolved the stay and directed discovery to be complete by May 15, 2009, and trial to be held in late June 2009. *See* Order of November 10, 2008 (Appendix).

Toward the end of the allotted period for discovery, Banks sought to partially discontinue the original jurisdiction issues. They sought to preserve those issues decided against them in preliminary objec-

---

late jurisdiction, and it challenged the Department's order dismissing Banks in the Freedom conversion proceedings. The matter docketed at 157 C.D.2005 was resolved by the Supreme Court in *Pa. Bankers–Appellate II* and is no longer at issue.

The cases were consolidated, but the Court effectively bifurcated the appellate jurisdiction issues from the original jurisdiction issues.

4. Justice Eakin dissented. He would affirm the Commonwealth Court.

tions and to discontinue all other issues. If approved, the partial discontinuance would obviate the need for a trial and allow an immediate appeal on the issues where interlocutory appeal was previously quashed. Because Banks had not yet proved standing so as to preserve any original jurisdiction issues, the Court declined to approve a partial discontinuance. *See* Orders of April 15, 2009 (Appendix).

Ultimately, Banks declined the opportunity to prove standing or the factual basis for their constitutional challenges raising uniformity of taxation and equal protection claims. Banks voluntarily discontinued *all* original jurisdiction issues. *See* Orders of May 29, 2009 (Appendix).

### c. Related Appellate Proceedings

While the cases involving TruMark and Freedom proceeded through the state courts, a similar case involving Belco Community Credit Union was also progressing. The Department considered Belco's request to convert its membership to community-based, with the "local community" identified as a seven-county area of south-central Pennsylvania. The Department denied the request of several banks and the bankers' association for a hearing and for access to Belco's confidential information. Belco's application was deemed approved.

On appeal to this Court, the banks challenged the failure to hold a hearing. They also challenged the Department's refusal to allow discovery of proprietary information, raising arguments almost identical to those raised in the current appeal. Speaking through Judge (now Senior Judge) Friedman, a panel of this Court vacated the deemed approval allowing Belco's membership conversion and remanded for a hearing. Because the Court decided that withholding the proprietary information denied due process to the banks, we

directed that the banks have access to the information on remand. *Pa. Bankers Ass'n v. Pa. Dep't of Banking,* 910 A.2d 767 (Pa.Cmwlth.2006) (*Belco I*), *rev'd and remanded,* 599 Pa. 496, 962 A.2d 609 (2008) (*Belco II*).

On further appeal, a divided Supreme Court reversed and remanded. *Belco II.* The majority concluded the banks failed to establish standing and waived any right to a hearing. The Court also held that in the absence of standing, a due process right to discovery did not attach. The case was remanded to this Court to address remaining constitutional challenges arising from the banks' discovery requests.

Justice Saylor authored a dissenting opinion, joined by Chief Justice Castille, in which he expressed the view that the banks' standing was adequately stated. Regarding the discovery of confidential material, the dissenting justices would remand to the Department to determine the scope of materials to be provided and the conditions for disclosure. They noted that much of the information submitted by Belco to the Department was not proprietary in nature. *Id.* at 530–31, 962 A.2d at 630.

### III. Current Appeal

The current proceedings result from the Supreme Court's order reversing our decision in *Pa. Bankers I* that Banks lacked standing to intervene in the Department's proceedings. On remand, we undertake a merits review of the issues raised in Banks' appeal of the Department's decisions approving Credit Unions' Conversion Notices. The issues before us are whether the Department: erred by determining the five-county proposed community constitutes a "well-defined local community;" issued a decision not supported substantial evidence; erred by invoking the doctrine of official notice; and denied Banks due process by limiting their access to informa-

tion solely to documents Credit Unions voluntarily disclosed. As the central concern is the fully-litigated challenge to the Department's determination of "well-defined local community," which involves several of the issues stated above, we begin there.

## A. Well–Defined Local Community

■ At the outset, we note our review of an agency adjudication is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether errors of law were made, or whether constitutional rights were violated. *Shapiro v. State Bd. of Accountancy*, 856 A.2d 864 (Pa.Cmwlth. 2004). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Minicozzi v. Workers' Comp. Appeal Bd. (Ind. Metal Plating, Inc.)*, 873 A.2d 25 (Pa.Cmwlth.2005). An abuse of discretion occurs where the findings of fact are not supported by substantial evidence. *Hafner v. Zoning Hearing Bd. of Allen Twp.*, 974 A.2d 1204 (Pa.Cmwlth.2009). Further, we are required to give due deference and great weight to the administrative agency's interpretation of a statute it is charged with enforcing and may not disregard or overturn its interpretation without cogent reasons and a decision determining the agency was clearly erroneous. *Rinaldi v. Bd. of Vehicle Mfrs., Dealers & Salespersons*, 843 A.2d 418 (Pa. Cmwlth.2004).

■ In addition, there is no question Credit Unions had both the burden of production (sufficient evidence) and persuasion (credible evidence). *Siemon's Lakeview Manor Estate v. Dep't of Pub. Welfare*, 703 A.2d 551 (Pa.Cmwlth.1997). The burdens of production and persuasion (often referred to as the weight of the evidence) are not the same. "[T]he former

remains on the party upon whom is imposed the duty of producing a certain amount of evidence in order that he may not lose summarily while the latter involves the credibility [or] persuasive quality of the evidence produced...." *Morrissey v. Dep't of Highways*, 424 Pa. 87, 92, 225 A.2d 895, 898 (1967).

Banks first assign error in the Department's finding that the five-county area constitutes a well-defined local community. The Department, according to Banks: 1) improperly treated the NCUA Manual criteria as guidelines rather than as binding requirements; 2) improperly relied on the Federal Office of Management and Budget's (OMB) metropolitan statistical area classifications to evaluate economic and social interaction; 3) failed to properly evaluate evidence of the sharing of interests and integration of the proposed community; and, 4) erroneously classified the region as a well-defined local community. Banks do not contest the proposed community is well-defined. They take issue with the Department's conclusion it is a "local community."

### 1. NCUA Manual

Banks assign error in the Department's decision to treat the criteria for establishing community-based credit unions in the NCUA Manual as guidelines. Banks contend the NCUA Manual criteria have the effect of federal regulations and are therefore binding norms. Banks further contend the General Assembly intended to bind the Department to all federal requirements when it enacted the federal parity provision, which referenced Section 109 of the Federal Credit Union Act.

The Department argues that its interpretation of the General Assembly's direction in the federal parity provision is entitled to great deference. The Department interpreted the legislative mandate

as requiring an evaluation of the NCUA's definition of "well-defined local community" and proof of common interests. Other criteria in the NCUA Manual relate to credit unions seeking their initial charter or to matters which may be evaluated during yearly examinations, not during conversion proceedings.

As quoted above, the federal parity provision found in 17 Pa.C.S. § 501(e)(2) allows a state-chartered credit union to create, amend or expand its field of membership as authorized by Section 109 of the Federal Credit Union Act, "subject to reasonable conditions, limitations and restrictions as may be imposed by the [D]epartment, including, but not limited to, conditions, limitations and restrictions based upon safety and soundness."

■ We reject Banks' contention that this statutory language was meant to limit the Department's discretion in dealing with community membership conversions. To the contrary, the plain language of the federal parity provision preserves for the Department discretion to impose its own reasonable conditions, limitations and restrictions.

Further, we view as reasonable the Department's interpretation that some requirements for new community credit unions would not necessarily apply to credit unions, such as those here, with long existence within a community which seek to convert membership fields. Similarly, we find no fault with the Department's interpretation that NCUA Manual requirements for serving low income or underserved areas may be addressed on a case-by-case basis, depending on the location of an office, during annual reviews rather than during community membership conversions. *See* 17 Pa.C.S. § 503 (credit unions shall be examined at least annually); R.R. at 1538a–43a. These are matters best left to the administrative expertise of the Department, to whose discretion we defer, in the absence of clear legislative direction to the contrary. *Rinaldi.*

Finally, the Department applied the language of the NCUA Manual pertaining to the definition of "well-defined local community" and to proof of the common interests it contemplates. The application of the language is discussed at length below. To the extent the Department actually applied the NCUA Manual, Banks fail to explain prejudice from any description of the Manual criteria as "guidelines."

### 2. Metropolitan Statistical Area

■ Banks contend the Department erroneously relied on the OMB's classification of the Philadelphia–Camden–Wilmington area as a metropolitan statistical area, and Philadelphia's status as the hub of the metropolitan division comprised of Philadelphia, Bucks, Chester, Delaware and Montgomery Counties.[5] In particular,

---

**5.** The Office of Management and Budget (OMB) establishes metropolitan and metropolitan statistical areas throughout the country. Factors relevant to classification include population and a high degree of social and economic integration based on commuting ties. Reproduced Record (R.R.) at 1270a.

Metropolitan statistical areas are further subdivided into metropolitan divisions. A metropolitan division is defined as "[a] county or group of counties with a Core Based Statistical Area that contains a core with a population of at least 2.5 million." 65 Fed.Reg. 82238 (December 27, 2000). A core based statistical area is a "statistical geographic entity consisting of the county or counties associated with at least one core (urbanized area or urban cluster) of at least 10,000 in population, plus adjacent counties having a high degree of social and economic integration . . . as measured through commuting ties with the other counties containing the core." Id. A metropolitan division consists of one or more main and/or secondary counties that represent employment centers, plus adjacent coun-

Banks assert Philadelphia County does not qualify as a main county for purposes of a metropolitan division because there are insufficient commuting ties within the proposed community. They further assert the evidence shows the four outlying counties are more closely integrated with areas located outside the proposed community. In addition, Banks argue Montgomery County may be recognized as the hub of a metropolitan division based on recent economic development and commuting trends.

While Banks challenged commuting ties, the Department was free to reject their evidence in favor of facts showing the Federal government recognizes a metropolitan division consisting of the same five counties of the proposed community. By its very designation, a metropolitan division shows a high degree economic and social integration. A Banks' witness acknowledged this. R.R. at 496. The Department rejected Banks' assertions commuting patterns do not support a finding of economic and social interaction because the vast majority of residents within the proposed community live and work in the five-county area. TruMark Dec., 12/22/04 at 18–19, R.R. at 1220a–21a; Freedom Dec., 12/22/04, at 18–19, 21, 23, R.R. at 1251a–52a, 1254a, 1256a. As fact finder, the Department could give greater weight to the OMB's classification. *Minicozzi* (fact find-

er has exclusive province over evidentiary weight and witness credibility).

More to the point, however, is that designation of the five-county area as a metropolitan division dictates Credit Unions' burden of proof on the Conversion Notices. The NCUA Manual provides that if the proposed community does not meet the metropolitan statistical area requirement,[6] the applicant must submit a letter and supporting documentation describing how the area meets the standards for community interaction or common interests. R.R. at 1527a–29a. It is the applicant's responsibility to show the relevance of the documentation in a narrative form. *Id.*

### 3. Sharing of Interest and Interaction

Banks' next assertion is that the Department failed to properly evaluate evidence of the sharing of interests and integration of the proposed community. Banks contend the record lacks substantial evidence showing integration throughout the proposed community. They further contend it was not enough for Credit Unions to show the means of community integration and common interests. Credit Unions, according to Banks, must show the *extent* of interaction within the proposed community (for example, the percentage of proposed

---

ties associated with the main county or counties through commuting ties.

In this case, the OMB established Philadelphia as the hub of the Philadelphia–Bucks–Chester–Delaware–Montgomery metropolitan division of the Philadelphia–Camden–Wilmington metropolitan statistical area. R.R. at 1312a.

6. Under the NCUA Manual, the well-defined local community requirement may be met if the area to be served is a metropolitan statistical area or its equivalent, or a portion thereof, where the population of the area or its equivalent does not exceed 1,000,000. R.R. at 1527a–29a. In this case, the population of the proposed area exceeds 1,000,000; thus,

Credit Unions had to provide additional evidence of community interaction and common interests.

Banks argue that the Department made an error of law in deciding that the metropolitan statistical area was presumptively a local community. A careful reading of the Department's decision, however, reveals that the Department did not treat the metropolitan statistical area as a presumptively local community; rather, the Department required and evaluated supplemental evidence submitted by Credit Unions. TruMark Dec., 12/22/04, at 17, R.R. at 1219a; Freedom Dec., 12/22/04, at 19, R.R. at 1252a.

community residents attending sporting events in Philadelphia).

■ The Federal regulation addressing the term "local community" for charter purposes suggests a fluid application:

[t]he meaning of local community, neighborhood, or rural district includes a variety of factors. Most prominent is the requirement that the residents of the proposed community area interact or have common interests. In determining interaction and/or common interests, a number of factors become relevant. For example, the existence of a single major trade area, shared governmental or civic facilities, or area newspaper is significant evidence of community interaction and/or common interests. Conversely, numerous trade areas, multiple taxing authorities, and multiple political jurisdictions, tend to diminish the characteristics of a local area.

Population and geographic size are also significant factors in determining whether the area is local in nature. A large population in a small geographic area or a small population in a large geographic area, may meet NCUA community chartering requirements. For example, an ethnic neighborhood, a rural area, a city, and a county with 300,000 or less residents will generally have sufficient interaction and/or community interests to meet the community charter requirements. *While this may most often be true, it does not preclude community charters consisting of multiple counties or local areas with populations of any size from meeting community requirements.*

Conversely, a larger population in a large geographic area may not meet NCUA community chartering requirements. It is more difficult for a major metropolitan city, a densely populated county, or an area covering multiple counties with significant population to have sufficient interaction and/or common interests, and to therefore demonstrate that the areas meet the requirement of being "local." *In such cases, documentation supporting the interaction and/or common interests will be greater than the evidence necessary for a small and less densely populated area.*

63 Fed.Reg. 72037 (December 30, 1998) (emphasis added). Examples of acceptable documentation include:

• The defined political jurisdictions;
• Major trade areas (shopping patterns and traffic flows);
• Shared/common facilities (for example, educational, medical, police and fire protection, school district, water, etc.);
• Organizations and clubs within the community area;
• Newspapers or other periodicals published for and about the area;
• Maps designating the area to be served. One map must be a regional or state map with the proposed community outlined. The other map must outline the proposed community and the identifying geographic characteristics of the surrounding areas;
• Common characteristics and background of residents (for example, income, religious beliefs, primary ethnic groups, similarity of occupations; household types, primary age group, etc.); or
• Other documentation that demonstrates that the area is a community where individuals have common interests or interact.

*Id.* at 72038.[7]

■ Initially, we recognize it would seem unlikely that a large geographic area

---

7. Banks argue the documents attached to

Credit Unions' Conversion Notices are hear-

with a significant population could constitute a "well-defined local community." Our task, however, is not to make such a finding but only to decide whether substantial evidence supports the Department's finding to that effect. In its determinations, the Department found Credit Unions' Conversion Notices contained evidence of the proposed community constitutes a "well-defined local community" based on historical ties; public transportation; highways; entertainment; sports and cultural events; shopping centers; governmental and community organizations; and shared media. TruMark Dec., 12/22/04, at 9–10, 17–19, R.R. at 1211a–12a, 1219a–21a; Freedom Dec., 12/22/04, at 10–11, 20–23, R.R. at 1243a–44a, 1253a–56a. The evidence supports the Department's conclusion.

To start the process of conversion, Credit Unions looked to other area enterprises to define their community. R.R. at 346a; 366a. This type of information typically aids economists in defining a community. *Id.* at 415a. In all, Credit Union presented evidence of over 12 governmental, busi-

ness, and civic organizations which define Greater Philadelphia to include the five counties comprising the proposed community. *Id.* at 346a; 368a; 424a–426a; 2186a–87a; 2205a–09a; 2210a–18a; 2244a; 2283a–93a; 2320a–22a; 2353a–68a; 2398a; 2407a; 2490a; 2492a; 2494a–95a; *see also* 2159a–72a (Ted Hershberg, *Case for Regional Cooperation*, The Regionalist, vol. 1, no. 3 (December 1995)).

Credit Unions' witness testified that a hub is necessary to show a central point of community interaction. *Id.* at 389a. To demonstrate this, Credit Unions presented evidence of cultural and historical venues in the City of Philadelphia allowing for interaction within the proposed community. They also presented evidence of annual festivals and the like which draw residents from the proposed community to the City. *Id.* at 2454a–85a.

Credit Unions' witnesses further identified shared media within the proposed community: major television network affiliates are located in Philadelphia and broadcast in the five counties. *Id.* at 346a. The Philadelphia Inquirer, local business

say to which Banks properly objected and, as such, cannot support the Department's determination. *See Walker v. Unemployment Comp. Bd. of Review*, 27 Pa.Cmwlth. 522, 367 A.2d 366 (1976) (properly objected to hearsay evidence is not competent to support an agency determination). We discern no reversible error, for several reasons.

First, the documents attached to Credit Unions' Conversion Notices were required to be attached. R.R. at 1527a–29a. They are therefore in the nature of operative facts which are not hearsay. *See* Pa. R.E. 801, Comment (out-of-court statements with direct legal significance, including out-of-court statements offered to prove compliance with statutory obligation, are not hearsay).

Second, Credit Unions' economic expert testified that the documentation attached to the Conversion Notices is the type of information he considers when defining a community. R.R. at 430a. As an economist, he looks to such information as census data, data from

government agencies, regional transportation grids, cultural facilities, commuting patterns, shopping patterns, and expenditure patterns. *Id.* at 415a–16a. Credit Unions' economist reviewed many of the documents attached to TruMark's Conversion Notice and indicated whether the entity views the proposed community within its territory. *Compare id.* at 423a–31a *with* 2031a; 2034a; 2036a; 2107a–2498a.

An expert must testify as to the facts or data on which his opinion is based. Pa. R.E. 705. An expert witness may offer an opinion that is based, in part, on otherwise inadmissible hearsay, if it is of a type that is customarily relied on by the expert in the practice of the expert's profession. Pa. R.E. 703; *Commonwealth v. Thomas*, 444 Pa. 436, 282 A.2d 693 (1971). Thus, the Department did not commit reversible error by receiving into evidence the documents relied upon by the expert witness.

journals and local magazines are distributed throughout the proposed community. *Id.* at 347a; 369a–370a; 2101a; 2492a–96a.

There is also evidence of community interaction and integration by way of two major shopping centers and four professional sports teams which draw people to the Philadelphia area. *Id.* at 347a; 368a–69a; 2418a–20a; 2485a–86a. In addition, there are several major highways traversing the proposed community, and the Southeastern Pennsylvania Transportation Authority operates in each of the five counties. *Id.* at 347a; 368a; 423a; 2246a–2248a; 2253a–55a. Unlike other airports within the proposed community, the Philadelphia International Airport offers international flights. *Id.* at 347a; 423a; 2034a; 2070a. Amtrak also services the Philadelphia area. *Id.* at 353a. The various modes of transportation are feeder lines connecting center city Philadelphia to the suburban counties. *Id.* at 423a.

On the other hand, Banks produced contrary evidence supporting the position the proposed community is not economically and socially integrated. Banks' evidence focused primarily on the number of municipalities, school districts, libraries, police and fire departments, community colleges, newspapers, television stations, shopping malls, chambers of commerce and visitors' bureaus. As stated above, numerous trade areas, multiple taxing authorities, and multiple political jurisdictions tend to diminish the characteristics of a local area. 63 Fed. Reg. at 72037. Banks also offered evidence of commuting patterns.

Having concluded Credit Unions presented sufficient evidence showing the five counties meet the standards for community interaction and common interests, the Department was then required to determine whether Banks' countervailing evidence outweighed Credit Unions' evidence. The Department expressly gave less weight to Banks' evidence, and it explained why. We discern neither error nor abuse of discretion in this regard for several reasons.

First, neither the Federal regulation cited above nor the NCUA Manual provides a clear method to assess integration and shared community interests. The NCUA Manual provides the types of documents which may be used to show community integration and shared interests. Some factors may show a high degree of integration while others may show integration to a lesser degree. No particular factor can dictate. The Department must therefore look to the overall evidence of integration and shared interests to determine whether a community is one that is well-defined and local. Moreover, the relevant inquiry is whether Credit Unions submitted proof a reasonable mind would accept as adequate to support the conclusion the proposed community constitutes a well-defined local community. *See generally Wilbert v. Pittsburgh Consolidation Coal Co.,* 385 Pa. 149, 155, 122 A.2d 406, 409 (1956) ("[p]roofs to a degree of absolute certainty are rarely attainable; it is sufficient if they are such as to satisfy a reasonable mind"); *Saganowich v. Hachikian,* 348 Pa. 313, 35 A.2d 343 (1944) (same).

In addition, the term "local" is not as narrowly interpreted as Banks would like. The Federal regulation, above, specifically provides that charters consisting of "multiple counties or local areas with populations of any size" may meet the community requirements. 63 Fed.Reg. 72037. In view of the expansive language of the Federal regulation, we cannot state that the Department's broad application is prohibited. For support, the Department cites several NCUA orders approving fields of membership for large geographic and populous areas, namely, U.S. Airways Federal Credit Union (including ten counties in western

Pennsylvania); Los Angeles Federal Credit Union (including Los Angeles County, California, with a population of nine million people); and Bethpage Federal Credit Union (including Nassau County, New York, with a population of 2.7 million). Dept's Remand Br., at 35–36. While we agree with Banks that every charter must be based solely on the evidence presented, the Department's reference to the NCUA orders merely demonstrates that a large population or geographic area does not preclude a finding of a local community. *See* R.R. at 494a (witness acknowledges size is not a disqualifier for purposes of a well-defined local community).[8]

■ Finally, Banks argue that the Department capriciously disregarded its evidence that the five-county area is not integrated into a local community based on commuting. A capricious disregard is the deliberate and baseless disregard of apparently reliable evidence. *Hellam Twp. v. Hellam Twp. Zoning Hearing Bd.*, 941 A.2d 746 (Pa.Cmwlth.2008). Where substantial evidence supports the agency's findings, which in turn supports the agency's conclusions, it should be a rare instance where an appellate court disturbs an adjudication based on capricious disregard. *Id.*

In this case, Banks' argument lacks merit. The Department did not disregard Banks' evidence on this point. Instead, it considered and rejected the evidence, explaining its reasons for doing so. Tru-Mark Dec., 12/22/04, at 18–19, R.R. at

1220a–21a; Freedom Dec., 12/22/04, at 18–19, 21, 23, R.R. at 1251a–52a, 1254a, 1256a. Thus, the Department did not capriciously disregard this evidence.

■ Moreover, an administrative agency is only required to make the findings necessary to resolve the issues raised by the evidence and relevant to the decision; it is not required to provide a line by line analysis of the evidence. *Gumm v. Workers' Comp. Appeal Bd. (Steel)*, 942 A.2d 222 (Pa.Cmwlth.2008). Thus, the Department was not required to write an opinion discussing each item of evidence offered by Banks.

**4. Region v. Local Community**

Moreover, we are not persuaded by Banks' argument the proposed community is more aptly identified as a region. The Department, Banks contend, blurs the distinction between the requirements of a well-defined community and a local community. As proof, they point to evidence in Credit Unions' Conversion Notices showing a number of the governmental and private organizations describing the Greater Philadelphia areas as a region without clear boundaries.

We reviewed Credit Unions' documentary evidence. In that evidence, the majority of organizations which specifically identify a service area include the five-county area comprising the proposed community within their territory. *Id.* at 2186a–87a; 2205a–09a; 2210a–18a; 2244a–45a; 2283a–

---

8. We do not believe the recent Federal district court memorandum decision in *American Bankers Association v. National Credit Union Administration*, No. 1:05–CV–2247, 2008 WL 2857678 (M.D.Pa., July 21, 2008) (Kane, C. J.), mentioned by Banks as exemplifying the type of scrutiny this issue deserves, compels a different result here. In that case the district court granted a challenge to the approval of a Federal-chartered credit union's community

conversion involving six counties in central Pennsylvania.

That case is distinguishable both procedurally and factually. In particular, the NCUA did not hold a hearing in that case, it did not explain why it discounted uncontroverted information tending to show a lack of common interests, and it provided no explanation for its change of position on an important issue.

93a; 2320a–22a; 2353a–68a; 2398a; 2407a; 2490a; 2492a; 2494a–95a. In light of Credit Unions' accepted evidence, the distinction between a "region" and "well-defined local community" is one of semantics, and Banks' argument to the contrary is not convincing.

Banks argue that the Department capriciously disregarded evidence that no consensus exists as to the boundaries of the Greater Philadelphia area; therefore, the area is a region and not a local community. Contrary to Banks' argument, the Department did not disregard Banks' evidence and arguments on this point. Rather, the Department considered the evidence and arguments, and it rejected them, explaining its reasons. TruMark Dec., 12/22/04 at 19, R.R. at 1221a; Freedom Dec., 12/22/04, at 22–23, R.R. at 1255a–56a. Thus, it did not capriciously disregard this evidence. *Hellam Twp.*

As a final matter, the Department reviewed the entire record and, based on the findings of fact, accepted Credit Unions' evidence as more persuasive than Banks. Determinations as to evidentiary weight fall exclusively within the Department's province as fact finder. *Koppenhaver v. Dep't of Cmty. & Econ. Dev.*, 898 A.2d 654 (Pa.Cmwlth.2006). Accordingly, we cannot disturb the Department's decision to accept Credit Unions' evidence over that of Banks.

In sum, a reasonable mind could conclude based on the evidence presented that the proposed community is a well-defined local community for purposes of credit union field of membership. Therefore, we must reject Banks' assertions that sub-stantial evidence does not support the Department's orders approving Credit Unions' Conversion Notices.

## B. Compliance with Statutory Law

In this assignment of error, Banks contend the Department failed to make necessary findings as required by the Banking Code of 1965 [9] and the Department of Banking Code,[10] and it also failed to strictly construe Section 517 of the Credit Union Code (pertaining to exemption from taxation). In the latter assertion, Banks contend the Department was required to analyze whether it is in the public interest to forfeit tax revenue due to expansion of Credit Unions. Banks further argue Credit Unions failed to demonstrate the need for financial services in the proposed community and whether they will offer services materially different than those currently offered.

### 1. Banking Code of 1965 and Department of Banking Code

We reject Banks' argument the Department failed to make necessary findings in accordance with Section 103 of the Banking Code of 1965 [11] and Section 202A of Department of Banking Code.[12] Neither Code applies to credit unions. *See* Section 102 of the Banking Code of 1965, 7 P.S. § 102 (defining incorporated institution as a bank, a bank and trust company, a trust company or savings bank); Section 2 of the Department of Banking Code, 71 P.S. § 733–2 (expressly excluding credit unions from the definition of institution); and Section 15 of the Department of Banking

---

9. Act of November 30, 1965, P.L. 847, *as amended*, 7 P.S. §§ 101–2204.

10. Act of May 15, 1933, P.L. 565, *as amended*, 71 P.S. §§ 733–1–733–1204.

11. 7 P.S. § 103 (relating to declaration of purposes; standards for exercise of power and discretion by Department).

12. 71 P.S. § 733–202A (relating to general scope of supervision; exercise of discretion).

Code, 71 P.S. § 733–15 (providing that unless expressly stated, provisions of the Code do not apply to credit unions). *See also Belco II.*

### 2. Statutory Construction Act

Further, we discern no error in the Department's failure to undertake an analysis of the tax consequences of Credit Unions' expansion. Section 1928 of the Statutory Construction Act of 1972 requires strict construction of provisions exempting persons and property from taxation. 1 Pa. C.S. § 1928(b)(3). However, the applicability of the Statutory Construction Act to the present case is questionable.

■ The relevant tax statute is found in Section 517 of the Credit Union Code, 17 Pa.C.S. § 517 (credit union tax provision), which exempts a credit union from taxation on its assets except as to real estate owned by it. In this case, Credit Unions are not disputing their tax obligations. "[T]he rule of strict construction is inapplicable where ... there is no reasonable doubt as to construction of provisions of the tax statute or their application to a particular case." *Phila. Gas Works ex rel. City of Phila. v. Commonwealth,* 741 A.2d 841, 846 n. 6 (Pa.Cmwlth.1999).

■ Even if statutory construction applies to the credit union tax provision, Banks fail to cite any authority requiring that the Department review the tax consequences of credit union applications and/or charter conversions. Rather, initial Departmental consideration of a credit union's articles of incorporation is limited to:

(1) Whether the character and general fitness of the incorporators, directors and the treasurer named in the articles of incorporation is satisfactory.

(2) Whether the character and number of the group proposed to be served affords reasonable promise of sufficient support for the enterprise so as to make the establishment of the proposed credit union economically advisable.

(3) Whether the incorporators, directors and group proposed to be served have a common bond of association as provided in [17 Pa.C.S. § 701] (relating to membership).

(4) Whether the proposed credit union unduly encroaches upon the field of membership of any other credit union.

(5) Whether the application is in proper form and within the purpose of this title.

(6) Whether the savings of members paid for shares will be insured by the [NCUA] or other share insurance fund approved by the [D]epartment. . . .

17 Pa.C.S. § 304(a). Taxing issues are not among the statutorily-identified factors the Department must consider when approving a credit union's articles of incorporation. *Id.*

Moreover, for the following reasons we find no indication the General Assembly harbored an unexpressed intention that the Department undertake a tax analysis. First, Section 501 of the Credit Union Code identifies the general and special powers of a credit union. 17 Pa.C.S. § 501. This Section also provides for federal parity, allowing a credit union to engage in any activity permitted under the Federal Credit Union Act. 17 Pa.C.S. § 501(e). A credit union is required to notify the Department in writing at least 30 days before it engages in any activity or acquires an interest as permitted by the federal parity provision. 17 Pa.C.S. § 501(f). In furtherance of application review, Subsection (g) provides:

Except as otherwise agreed to by a credit union, the [D]epartment shall be deemed to have granted approval for a credit union to engage in an activity or acquire an interest if within 30 days of

receipt of written notice from a credit union the [D]epartment does not act. 17 Pa.C.S. § 501(g) (deemed approval provision).

Assuming there is a latent statutory ambiguity which requires interpretation, an implied duty of tax analysis is inconsistent with the Department's express duty to act on matters within the narrow 60–day time period provided in the Credit Union Code. In other words, the deemed approval provision leaves too little time for such an evaluation. We presume the General Assembly did not intend such an unreasonable result. 1 Pa.C.S. § 1922(1).

Second, we question whether the Department is the proper body to evaluate tax consequences and revenue sources for the Commonwealth. *See Koppenhaver* (in proceeding under Debt Act,[13] Department of Community and Economic Development not proper forum to consider issues relating to immunity from real estate tax). Instead, more appropriate forums are the General Assembly or a court. Thus, the Commonwealth Court may consider a constitutional challenge to a taxing scheme. Indeed, Banks brought such original jurisdiction challenges to the Commonwealth Court; however, they were discontinued shortly before trial.

Third, as discussed more fully below, the express guidance of the Supreme Court in *Conestoga National Bank of Lancaster v. Patterson*, 442 Pa. 289, 275 A.2d 6 (1971), and the General Assembly in the Credit Union Code does not clearly extend the

public interest in credit union conversions to the need for or uniqueness of services.

For these reasons, we discern no merit in Banks' assertion the Department erred by failing to consider possible tax consequences of Credit Unions' expansion into the proposed community.

### 3. Credit Union Code

Banks further maintain the Department failed to make necessary findings regarding Credit Unions' compliance with Sections 301(a), 304(a), and 501(e)(2) of the Credit Union Code.[14] In particular, the Department failed to make any findings on whether the Conversion Notices promote the purpose of the Credit Union Code[15] and whether Credit Unions' complied with Section 304(a) (articles of incorporation), recited above. Banks also assert the Department failed to make findings on whether Credit Unions complied with Section 501(e)(2) of the Credit Union Code, which in turn, requires compliance with the Federal Credit Union Act.

 "A reviewing court has the discretion to determine whether the findings that accompany an administrative agency adjudication are sufficient" and the "findings need only be enough to enable the Court to determine the questions and ensure that the conclusions follow from the facts." *Krebs Chrysler–Plymouth, Inc. v. State Bd. of Vehicle Mfrs., Dealers & Salespersons*, 655 A.2d 190, 193 (Pa. Cmwlth.1995).

---

**13.** 53 Pa.C.S. §§ 8001–8271.

**14.** 17 Pa.C.S. §§ 301(a) (relating to purposes of Credit Union Code); 304(a) (relating to Department consideration of articles of incorporation); 501(e)(2) (relating to federal parity).

**15.** Section 301(a) of the Credit Union Code, 17 Pa.C.S. § 301(a), provides:

A credit union maybe incorporated under this title for the purpose of promoting thrift among its members, creating a source of credit for such members at reasonable rates of interest and providing an opportunity for its members to use and control their own money on a democratic basis in order to improve their economic and social condition.

Overall, the Department made a total of 49 findings regarding Credit Unions' Conversion Notices. Most of the findings directly address the considerations relevant to community charters—the means of demonstrating a well-defined local community. A fair reading of the Department's conclusions reached from the findings shows the Department found Credit Unions' proved compliance with the Credit Union Code. *See* R.R. at 1229a–32a; 1264a–67a. We are satisfied the Department considered all of the factors required by the Credit Union Code for field-of-membership conversions. This is especially true here, because Credit Unions have been chartered and operating under yearly Department review in the geographic area in question for decades.

### C. Official Notice

In this assignment of error, Banks urge the Department erroneously took official notice of facts not of record, which in their view, are part of Credit Unions' burden of proof and subject to reasonable dispute.[16] In particular, Banks assert error where the Department took official notice of the history of the credit union movement; the notice provisions of the NCUA Manual as more stringent than that required for mergers and other changes to a bank's corporate structure; and, changes in the market conditions since the Supreme Court's decision in *Conestoga,* discussed below.

■■■■ The principles of due process require that parties be given notice the adjudicating body is considering specified information. *West Penn Power Co. v. Pa.*

*Pub. Util. Comm'n,* 50 Pa.Cmwlth. 164, 412 A.2d 903, 906 (1980). This is only true where the fact finder relies on officially noticed facts for its determination:

> [b]efore an administrative agency in an adjudication can base its findings on information contained in the records of other cases decided by itself, it must appear on the record that notice was given to the parties of record that the adjudicating body is considering specified information.... Only in this way can a party's fundamental due process rights of notice and opportunity to be heard be protected.

*Id.* at 906 (quoting *City of Erie v. Pa. Pub. Util. Comm'n,* 41 Pa.Cmwlth. 194, 398 A.2d 1084, 1086 (1979)) (emphasis added).

■■■■ The underlined text emphasizes that an administrative agency must place any facts of which it takes official notice on the record if the facts are intended to support the agency's adjudication. Here, the Department does not dispute it failed to place those facts of which it took official notice on the record, and we reject the Department's assertions the General Rules of Administrative Practice and Procedure require only a post-decision opportunity to dispute the officially noticed facts as contrary to case law. *West Penn Power Co.; see also Kyu Son Yi v. State Bd. of Veterinary Med.,* 960 A.2d 864, 877 n. 22 (Pa. Cmwlth.2008) ("even if an agency is taking official notice of something as indisputable as a record of a case decided by the agency itself, notice must be given to the parties").

---

**16.** 1 Pa.Code § 35.173 provides:

Official notice may be taken by the agency head or the Presiding Officer of such matters as might be judicially noticed by the courts of this Commonwealth, or any matters as to which the agency by reason of its functions is an expert. Any participant shall, on timely request, be afforded an opportunity to show the contrary. Any participant requesting the taking of official notice after the conclusion of the hearing shall set forth the reasons claimed to justify failure to make the request prior to the close of the hearing.

■ Nevertheless, we conclude the Department's failure to place the officially noticed facts on the record during the hearings was harmless error. The officially noticed facts here are not statutorily-identified factors the Department must review when proceeding on Credit Unions' Conversion Notices. *See* 17 Pa.C.S. §§ 304(a); 502(e)(2).

Further, some of the information about which Banks complain is available from case law and is a proper subject of notice. Thus, history of the credit union movement has been discussed by the United States Supreme Court and by our appellate courts. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998); *Pa. Bankers–Appellate II; Pa. Bankers–Appellate I.* Also, as described more fully below, legal changes occurring since the Supreme Court's 1971 decision in *Conestoga* are properly considered in the context of the government's evolving interest in process due. *See also Belco II,* 599 Pa. at 529, 962 A.2d at 629 (Saylor, J., dissenting) (recognizing today's complex financial marketplace).

Moreover, the Department simply did not rely on any of the official noticed facts to relieve Credit Unions of their burden or proof. The Department's findings of fact are based solely on Credit Unions' evidence that the proposed community is a "well-defined local community." *See* TruMark Dec., 12/24/04, at 7–11, R.R. at 1209a–13a; Freedom Dec., 12/24/04, at 7–12, R.R. at 1240a–45a. No reversible error is therefore apparent.

■ Demonstrable prejudice is a key factor in assessing whether procedural due process was denied. *State Dental Council & Examining Bd. v. Pollock,* 457 Pa. 264, 318 A.2d 910 (1974). An order of an administrative agency will not be disturbed for harmless error. *Capital BlueCross v. Pa. Ins. Dep't,* 937 A.2d 552 (Pa. Cmwlth.2007), *appeal denied sub nom. Sklaroff v. Ario,* 600 Pa. 106, 963 A.2d 906 (2009).

In this regard, we reject as unpersuasive Banks' attempts to argue prejudice. In particular, Banks make offers of proof on noticed facts. Banks' Remand Br. at 50–51. Banks were given the chance to prove all the facts they offer to prove in a June, 2009, trial in the Commonwealth Court. However, they declined to prove anything, instead opting to discontinue all original jurisdiction issues.

### D. Due Process

■ Banks contend the Department denied them procedural due process. The contention challenges the extent to which Banks were allowed access to Credit Unions' Conversion Notices. The contention targets business plans and marketing plans which Credit Unions were required to include in their Conversion Notices. *See* R.R. at 1993a; 2046a–47a (Conversion Notices' Tables of Contents). After extensive review, we discern no due process violation resulting from the Disclosure Order.

### 1. Non–Disclosure Provision

While the Department of Banking Code does not generally apply to credit unions,[17] certain provisions do apply. Specific to this appeal, Section 302(A)(2) of the Department of Banking Code, 71 P.S. § 733–302(A)(2) (Non–Disclosure Provision), provides in relevant part:

> Neither the secretary nor any deputy, examiner, clerk, or other employe of the [D]epartment shall publish or divulge to anyone any information contained in or

---

17. *See* 71 P.S. §§ 733–15.

ascertained from any examination or investigation made by the [D]epartment, or any letter, report, or statement sent to the [D]epartment, or any other paper or document in the custody of the [D]epartment, except when the publication or divulgement of such information is made by the [D]epartment pursuant to the provisions of this act, or when the production of such information is required by subpoena or other legal process of a court of competent jurisdiction....

In short, the Non–Disclosure Provision prohibits the Department from disclosing any information submitted by credit unions unless one of the limited exceptions applies. Pursuant to this statutory mandate, the Presiding Officer directed Credit Unions to turn over those portions of its Conversion Notices to which they voluntarily agreed as well as any other public documentation attached to the Notices.

### 2. *Conestoga*

Banks claim the Presiding Officer's Disclosure Order violates the rules of fundamental fairness and due process by allowing Credit Unions to determine which

documents are discoverable.[18] With respect to financial institutions appearing before the Department, Banks' argument is as follows. In *Conestoga*,[19] our Supreme Court held that procedural due process requires that protesting banks be given access to the information supporting the issue before the Department. Relying solely on the then-recent *Conestoga* decision, this Court held procedural due process requires disclosure of all supporting data even if the opposing party claims the material is confidential. *First Nat'l Bank of Milford v. Dep't of Banking*, 4 Pa. Cmwlth. 168, 286 A.2d 480 (1972) (*en banc*).

According to Banks, the order granting standing in the public interest specifically stated their due process rights must be consistent with *Conestoga*. They contend the Disclosure Order allowing Credit Unions to determine which portions of their Conversion Notices will be disclosed violates the *Conestoga* due process safeguards.[20]

### 3. Developments since *Conestoga*

As it existed at the time of the *Conestoga* decision in 1971, there were no types

---

**18.** As a general rule, discovery as provided by the rules of civil procedure are not available in administrative proceedings. *Weinberg v. Ins. Dep't*, 41 Pa.Cmwlth. 319, 398 A.2d 1120 (1979).

**19.** Factually, *Conestoga* involved a bank's right to a hearing in a competitor bank's branch approval request. Former Section 904 of the Banking Code of 1965, *formerly* 7 P.S. § 904, required a bank seeking to open a branch office to notify every banking institution within the same county of its application under certain circumstances. The Department denied Conestoga's hearing request to protest a competitor's application. The Supreme Court ultimately determined procedural due process required the Department to hold hearings on Conestoga's protest and to provide access to the Department's file and the competitor's supporting documentation. The Supreme Court observed that the prior

version of the Non–Disclosure Provision of the Department of Banking Code required disclosure "under any other law of the Commonwealth," which included the constitutional right of appeal and the right to due process.

**20.** Banks further rely on this Court's decision in *Belco* I, for the position that the Non–Disclosure Provision is unconstitutional to the extent it deprives parties to adjudications of the procedural safeguards established in *Conestoga*.

However, the Supreme Court reversed. *Belco II*. As to the constitutionality of the Non–Disclosure Provision, the Supreme Court determined we erred in deciding the issue. In light of the Supreme Court's order, Banks' continued reliance on this Court's decision in *Belco I* is inappropriate.

of information excepted from the Non–Disclosure Provision. Thus, Department employees could not release any type information they received as part of an application. Since 1971, the General Assembly amended the Provision several times, most notably in 2002, and now the Department is permitted to release some types of information. The types of information allowed to be released do not embrace the business and marketing plans at issue here.

Also, the Non–Disclosure Provision was amended to delete the language upon which the Supreme Court relied in *Conestoga*. Thus, the Non–Disclosure Provision no longer permits disclosure "under any other law of the Commonwealth."

Further, in 1976 the United States Supreme Court issued the seminal case addressing procedural due process, *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Factually, *Mathews* concerned the Social Security Administration's decision to discontinue cash benefits without affording the recipient a pre-decisional hearing. The Court rejected the recipient's claim that due process required the agency to provide a hearing prior to terminating benefits. After reviewing its recent decisions in the area, the Court stressed that, unlike some legal rules, procedural due process is not a technical conception with a fixed content unrelated to time place and circumstances. Ultimately, the Court established three factors which must be reviewed when considering what process is due before a property interest may be affected: the private interest affected by the government action; the risk of erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function and the administrative burdens

that additional or substitute procedural requirements would entail. *Id.* at 335, 96 S.Ct. 893.

Also noteworthy, our Supreme Court recently revisited the extent of disclosure in administrative proceedings governed by express legislative restrictions in *Pocono Manor Investors, LP v. Pennsylvania Gaming Control Board*, 592 Pa. 625, 927 A.2d 209 (2007). This case will be discussed below.

### 4. Discussion

■ Section 503(a.2) of the Credit Union Code, 17 Pa.C.S. § 503(a.2), authorizes the Department to hold administrative hearings on any matter pertaining to credit unions, subject to the Administrative Agency Law, 2 Pa.C.S. §§ 501–508. Section 504 of the Agency Law provides that no adjudication of a Commonwealth agency will be valid unless a party has reasonable notice of a hearing and an opportunity to be heard. 2 Pa.C.S. § 504. Reasonable notice includes the right to hear evidence presented against the party's position and the right of access to information necessary for preserving objections. *Grossman v. State Bd. of Psychology*, 825 A.2d 748 (Pa.Cmwlth.2003); *Balfour Beatty Constr. Inc. v. Dep't of Transp.*, 783 A.2d 901 (Pa.Cmwlth.2001).

■ Reasonable notice and opportunity to be heard are the quintessential elements of due process. Due process is a flexible concept and imposes only those procedural safeguards as the situation warrants. *LaFarge Corp. v. Ins. Dep't*, 557 Pa. 544, 735 A.2d 74 (1999); *Fountain Capital Fund, Inc. v. Pa. Secs. Comm'n*, 948 A.2d 208 (Pa.Cmwlth.2008), *appeal denied*, 600 Pa. 765, 967 A.2d 961 (2009). "The question of due process reasonably involves an inquiry into the nature of the process *actually* provided." *Shapiro*, 856 A.2d at 881 (quoting *Stone & Edwards Ins.*

*Agency, Inc. v. Dep't of Ins.*, 538 Pa. 276, 282, 648 A.2d 304, 307 (1994)) (emphasis in original). Moreover, due process notice requirements are non-technical, such that no particular form of notice or procedure is necessary. *Harrington v. Dep't of Transp., Bureau of Driver Licensing*, 563 Pa. 565, 763 A.2d 386 (2000).

With these principles in mind, a *Mathews* procedural due process analysis leads to a conclusion that the Department did not deny Banks due process.

At the outset of this analysis, it is useful to restate the context. Credit Unions made voluntary disclosure to Banks of information pertaining to whether the five-county area was a "well-defined local community." After notice, there was a full hearing on this issue, during which Banks cross-examined witnesses and presented witnesses of their own. After the hearing, the Department rendered detailed decisions. Thus, the issue of "well-defined local community" was robustly litigated here, and all parties received all process due on that issue. Therefore, in order for there to be a procedural due process deprivation supporting judicial relief, it must relate to some other necessary issue. Also, demonstrable prejudice is a key factor in assessing whether procedural due process was denied. *Pollock.*

Further, the current controversy between Banks and Credit Unions arises from the federal parity provision. Therefore, it is helpful to keep in mind the process available where a Federal-chartered credit union seeks to convert its membership field. Usually, there is *no* disclosure of confidential credit union information, even where there is a Freedom of Information Act request, 5 U.S.C. § 552. *See Nat'l Cmty. Reinvestment Coalition v. Nat'l Credit Union Admin.*, 290 F.Supp.2d 124 (D.D.C.2003) (recognizing NCUA routinely protects financial information from disclosure under the Freedom of Information Act).[21] Also, there is usually no adversarial hearing. *See, e.g., Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 347 F.Supp.2d 1061 (D.Utah 2004); *Cmty. First Bank v. Nat'l Credit Union Admin.*, 832 F.Supp. 1118 (W.D.Mich. 1993). Our conclusions regarding the process due in proceedings before the Department may therefore be compared to process due before the NCUA.

**a. Interests Affected**

Banks asserted a property interest in freedom from unfair competition with and loss of customers to Credit Unions that was implicated by the Department's action. However, Banks were permitted to intervene not on the basis of their private rights but in the public interest. In *Pa. Bankers–Appellate II*, the Supreme Court allowed appeals to proceed beyond a standing analysis to a merits review because Banks were not given sufficient notice that proof of competitive harm was needed. Given these unusual circumstances, and for the purposes of this litigation only, we will undertake a *Mathews* review assuming Banks have the property interest described above sufficient to require due process protections.

---

**21.** This is consistent with Federal regulation. Particularly, 12 C.F.R. § 792.11(a)(4), relevantly provides:

(a) All records of the NCUA or any officer, employee, or agent thereof, are confidential, privileged and exempt from disclosure, except as otherwise provided ..., if they are:

. . .

(4) Records which contain trade secrets and commercial or *financial information* which related to the *business*, personal or *financial affairs* of any person or organization, are furnished to the NCUA, and are confidential or privileged. .... (Emphasis added).

■ As to other interests, the Supreme Court in *Conestoga* referred to the rights of an applicant before the Department and to "the rights of the surrounding financial community." *Conestoga*, 442 Pa. at 298, 275 A.2d at 11. Thus, we will also consider the rights of the applicants, Credit Unions. Credit Unions have a property interest in protecting proprietary information, such as business plans and marketing plans.

■ Regarding the rights of the surrounding financial community, the Court in *Conestoga* noted that the failure of one of several competing institutions may lead to possible adverse effects to all. *Id.* The Court also quoted with approval from a Federal appellate court opinion acknowledging a community's vital interest in the solvency of its local banks. *Id.* at 299, 275 A.2d at 11, n. 8 (quoting *First Nat'l Bank of Smithfield, N.C. v. Saxon*, 352 F.2d 267, 273 (4th Cir.1965)). *See also Belco II*, 599 Pa. at 529, 962 A.2d at 629 (Saylor, J., dissenting) (Conestoga Court's acknowledgement of rights of surrounding financial community justified in today's complex financial marketplace). From these references we determine that the public interest which implicates due process in proceedings before the Department is the interest in the solvency, or safety and soundness, of financial institutions.

We reject Banks' suggestion that the public interest, at least in the procedural due process context of these administrative proceedings, extends beyond safety and soundness to an inquiry of all the requirements for community charter conversions in the NCUA Manual. *See* Banks' Remand Br. at 42; Banks' Remand Reply Br. at 16. The language of *Conestoga* cited above does not support such a broad reading of the public interest.

Further, the language of the Credit Union Code does not support such a broad reading. The federal parity provision refers to "safety and soundness," but it does not expressly refer to the need for or ability to provide services. Also, Section 109 of the Federal Credit Union Act, 12 U.S.C. § 1759, is incorporated by reference into the Credit Union Code's federal parity provision. That provision, however, directly addresses a regulation defining "well-defined local community" and the purposes for which such definition shall be used.[22]

In short, in the absence of clear direction from our Supreme Court or from

---

**22.** 12 U.S.C. § 1759, regarding "Membership," provides in relevant part:

(b) Membership field. Subject to the other provisions of this section, the membership of any Federal credit union shall be limited to the membership described in one of the following categories:
. . .
(3) Community credit union. Persons or organizations within a well-defined local community, neighborhood, or rural district.
. . .
(g) Regulations required for community credit unions
(1) Definition of well-defined local community, neighborhood, or rural district
The [NCUA] shall prescribe by regulation, a definition for the term "well-defined local community, neighborhood, or rural district" for purposes of—
(A) making any determination with regard to the field of membership of a credit union described in subsection (b)(3) [relating to community credit union membership] of this section; and
(B) establishing the criteria applicable with respect to any such determination.
(2) Scope of Application. The definition prescribed by the [NCUA] under paragraph (1) shall apply with respect to any application to form a new credit union, or to alter or expand the field of membership of an existing credit union, that is filed with [NCUA] after August 7, 1998.

the General Assembly, we are reluctant to allow the unelected administrators of the NCUA to redefine the "public interest" which triggers due process protections in proceedings before the Department.

### b. Risk of Erroneous Deprivation

We assume Banks have a property interest in freedom from unfair competition with and loss of customers to community-based Credit Unions which deserves due process protections. In the hearings, however, Banks did not prove that the community-based Credit Unions will have an unfair competitive advantage or that they will lose customers to Credit Unions. Moreover, there was a second chance for Banks to prove harm to their interest: the original jurisdiction part of the cases. Nevertheless, shortly before trial in the Commonwealth Court Banks discontinued these alternate proceedings. Because Banks had adequate opportunity to prove harm, and they declined the opportunity, we conclude they failed to establish demonstrable prejudice. *Pollock.* In the context of this vigorous litigation, we are not persuaded that there was significant risk that Banks were erroneously deprived of their assumed property interest.

Regarding the public's interest in the safety and soundness of Credit Unions' membership field conversions, our analysis is somewhat different. The Department reviewed Credit Unions' entire Conversion Notices. It reached conclusions as to safety and soundness of the proposed conversions. To the extent that *Conestoga* is still controlling, however, more is necessary to protect the public's interest.

The procedures in this case include additional safeguards which reduce any risk of erroneous deprivation of the public interest. The first additional safeguard was the full hearing on "well-defined local community." We consider this a safeguard of

the public interest because it addresses the General Assembly's basic requirement of a common bond for all credit unions. 17 Pa.C.S. §§ 303, 701(a); *see Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 493, n. 6, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) (during Great Depression, in contrast to widespread bank failures, there were no involuntary liquidations of state-chartered credit unions; cooperative nature of the institutions, which state law common bond provisions reinforced, believed to have contributed to this result). The General Assembly determined that the public interest in a common bond for state-chartered credit unions is protected in part by membership based in a "well-defined local community." Therefore, the hearing on this issue supplemented the Department's internal evaluation regarding safety and soundness.

A second additional safeguard was the receipt of evidence from Banks as to safety and soundness of Credit Unions' proposed conversions. In particular, Banks offered the deposition testimony of John Spier. R.R. at 580a–718a. He was offered as an expert in the following areas: 1) the marketing and business plans necessary for Credit Unions to serve their proposed communities; 2) the resources necessary to implement the marketing and business development plans; and 3) "*[t]he ability of [Credit Unions] to do so in a manner consistent with preserving their safety and soundness and providing effective and efficient service to their members.*" R.R. at 593a (emphasis added). Mr. Spier testified extensively in those areas.

We believe this evidence on safety and soundness, coupled with full litigation of the "well-defined local community" issue and the Department's internal review for safety and soundness, are sufficient to pro-

tect the public interest from erroneous deprivation.

We add that these additional safeguards, arising during the hearing, distinguish this case from *Conestoga,* where no hearing was held. These additional safeguards explain why a different result is appropriate here.

■■■ Under a *Mathews* analysis we also consider the probable value, if any, of additional or substitute procedural safeguards. Thus, we consider the probable value of disclosure of Credit Unions' financial projections and marketing plans. In light of our discussion above, we agree with the Presiding Officer, who made the following pertinent finding as part of the Disclosure Order:

> 6. Additionally, *the documents contained in Credit Unions' applications* are protected under the [Department of] Banking Code since, besides being proprietary in nature and containing sensitive financial projections and confidential marketing plans, they *are not necessary to the protection of [Banks'] property interests from which [they] draw their right to a hearing. [Banks] are highly sophisticated entities with the capability of utilizing existing demographics and market conditions to predict the impact the charter conversions will have on the Credit Unions and on themselves, if any.*

R.R. at 258a (emphasis added).[23]

### c. Government's Interest

Concerning the government's interest, including the function and administrative

burdens that additional procedural requirements would entail, Banks seek rehearing after disclosure.

The Department does not contend that disclosure of the full contents of Credit Unions' Conversion Notices would pose an administrative burden. Instead, the burden is legal in nature and relates to the continued validity of the Non–Disclosure Provision and to the predictability of future disclosure decisions.

As to rehearing, given the complexity and length of the proceedings thus far, there can be no doubt that rehearing will not resolve this controversy without substantial additional burden on the Department.

Furthermore, the government's interest can be assessed in light of the General Assembly's actions since *Conestoga* was decided. As mentioned above, since that 1971 decision, the General Assembly retained the bulk of the Non–Disclosure Provision, deleted language upon which the Supreme Court relied, and added some limited exceptions to the Provision which allow some types of information to be disclosed. Mindful of the presumption of constitutionality, 1 Pa.C.S. § 1922(3), we believe the General Assembly expressed its views as to the government's interest in the disclosure required by the Department in proceedings before it. Procedures here were consistent with the General Assembly's directions.

Finally, we find the Supreme Court's recent decision in *Pocono Manor Inves-*

---

23. We find no merit to Banks' claims the Presiding Officer's Disclosure Order denied information necessary to protect their right to a fair and impartial hearing officer. At no time during the agency hearings or subsequent appeals did Banks assert Departmental bias. Issues not properly preserved are deemed waived. *Julia Ribaudo Senior Servs. v. Dep't of Pub. Welfare,* 600 Pa. 641, 969 A.2d 1184 (2009). Moreover, we presume public officials perform their duties lawfully and in good faith until facts showing the contrary are averred, or averred and proved. *In re Redevelopment Auth. of City of Phila.,* 595 Pa. 241, 938 A.2d 341 (2007). Banks do not cite one instance casting doubt on the impartiality of the Department or its employees.

*tors, LP,* helpful. *Pocono Manor* involved the Gaming Control Board's (board) award of a slot machine license to Mount Airy Resort. Among other things, Pocono Manor challenged a denial of its right-to-know request for Mount Airy's economic impact information as a violation of its due process rights. On appeal, the Supreme Court considered Pocono Manor's challenge as one to the confidentiality provisions of the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101–1311.1. Similar to the Non–Disclosure Provision, the Gaming Act provides that all information submitted by an applicant for slot machine licensing or obtained by the board as part of background investigations shall be considered confidential; the Gaming Act prohibits the board from publicly disclosing the information. 4 Pa. C.S. § 1206(f). At the relevant time, board regulations defined "confidential" to include information relating to financial records and competitive marketing material. *Former* 58 Pa.Code § 401.4.

The Supreme Court concluded that when presented with a right-to-know request, the board first must determine whether the documents sought are subject to the confidentiality provisions of the Gaming Act. If so, the board is without authority to order disclosure of the documents specifically required to be maintained and protected as confidential.

Notably, the Supreme Court refused to expand already existing due process safeguards into the comparative evidence procedures provided by the gaming regulations because the General Assembly limited the board's authority. The Court further explained to require full disclosure would be inconsistent with the legislative mandate regarding confidentiality and the former Right to Know Law.[24]

We find the Supreme Court's reasoning applicable where, as here, the General Assembly placed restraints on the Department's ability to release information. We also find the Supreme Court's result in *Pocono Manor* to be in parity with the disclosure due in Federal-chartered credit union conversions.

For all the forgoing reasons, we discern no denial of due process.

## IV. Conclusion

After long and careful study, we discern no error of law in the Conversion Orders or in the Disclosure Order. Accordingly, we affirm.

## V. Appendix

### A. Order of November 10, 2008

### IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Bankers Association and the Pennsylvania Business Bank, Petitioners

v.

Pennsylvania Department of Banking and TruMark Financial Credit Union, Respondents

No. 42 M.D. 2005

Pennsylvania Bankers Association, Pennsylvania Business Bank, Fulton Bank, and Premier Bank, Petitioners

v.

Pennsylvania Department of Banking, Pennsylvania Department of Revenue, The Attorney General of the Commonwealth, and Freedom Credit Union, Respondents

---

**24.** *See* Act of June 21, 1957, P.L. 390, *as amended, formerly,* 65 P.S. §§ 66.1–66.4, repealed by the Act of February 14, 2008, P.L. 6.

No. 98 M.D. 2005

Pennsylvania Bankers Association and the Pennsylvania Business Bank, Petitioners

v.

Pennsylvania Department of Banking, Respondent

No. 157 C.D. 2005

Pennsylvania Bankers Association and the Northwest Savings Bank, Petitioners

v.

Pennsylvania Department of Banking, Respondent

No. 158 C.D. 2005

## ORDER

**AND NOW,** this 10th day of November, 2008, after status conference on October 29, 2008, it is **ORDERED and DECREED** as follows:

Applications to consolidate these cases with *Pennsylvania Bankers Association v. Pennsylvania Department of Banking* (*Belco Community Credit Union*), [910 A.2d 767 (Pa.Cmwlth. 2006], and with *Pennsylvania Bankers Association v. Pennsylvania Department of Banking* (*K of C Credit Union*), 495 M.D. 2006, are **DENIED;** and

All stays involving original jurisdiction issues are **DISSOLVED;** and

All pleadings shall be **CLOSED** within the next 30 days; and

Discovery involving original jurisdiction issues may recommence immediately and may continue so as to be completed by May 15, 2009; and

Any motion for summary relief (three copies) with a supporting brief (15 copies) must be filed by April 24, 2009. Any brief in opposition (15 copies) shall be filed by May 26, 2009. Any argument shall be

scheduled before the Court sitting in Philadelphia the week of June 8–12, 2009; and

Pretrial conference is scheduled for Wednesday, May 27, 2009, 10:00 a.m., Courtroom # 1, Fifth Floor, Irvis Office Building, Harrisburg, PA. Pretrial memoranda shall be filed and exchanged no later than May 20, 2009; and

Non-jury trial is tentatively scheduled for Wednesday, June 24, 2009, 9:30 a.m., Courtroom # 1, Fifth Floor, Irvis Office Building, Harrisburg, PA.

Argument on appellate matters remanded to this Court by Supreme Court Order dated September 24, 2008, shall be placed on the argument list of June 8–12, 2009 in Philadelphia. The Chief Clerk shall establish a briefing schedule allowing the parties to supplement previously filed briefs. *See* Pa. R.A.P. 2140.

/s/ Robert Simpson

## B. Orders of April 15, 2009

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Bankers Association and the Pennsylvania Business Bank, Petitioners

v.

Pennsylvania Department of Banking and TruMark Financial Credit Union, Respondents

No. 42 M.D. 2005

## ORDER

**AND NOW,** this 15th day of April, 2009, upon consideration of Petitioners' Application for Partial Discontinuance, and responses thereto, it is **ORDERED** and **DECREED** as follows: the Application is **DENIED.**[1]

/s/ Robert Simpson

---

1. When this original jurisdiction matter was previously before the Court on prelimi-

nary objections, Petitioners asserted that banks are similarly situated with credit unions and suffer unfair competition from credit unions. Petitioners asserted these points to establish standing as well as to counter demurrers. Petitioners argued that a factual record was needed before the Court could decide the issues. Largely on this basis certain preliminary objections were overruled. Petitioners now wish to avoid making a factual record.

No record on the issues of similar situation and unfair competition, or of standing generally, was developed before the Department of Banking in the matters in our appellate jurisdiction. *See Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 893 A.2d 864 (Pa.Cmwlth.2006) (opinion on appeals). Also, this Court believes some record is needed on these issues, for purposes of standing and for purposes of the merits of the claims. *See Pa. Bankers Ass'n v. Pa. Dep't of Banking*, (Pa.Cmwlth., Nos. 42 M.D. 2005, 98 M.D. 2005, filed March 1, 2006) (memorandum opinion on issues in original jurisdiction), Slip op. at 8–9, 11–14. Further, Petitioners are taking a position materially different than that previously advanced to this Court, without explanation. Id. slip Op. at 10–11. Accordingly, we decline the invitation to discontinue some, but not all original jurisdiction matters.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Bankers Association, Pennsylvania Business Bank, Fulton Bank, and Premier Bank, Petitioners

v.

Pennsylvania Department of Banking, Pennsylvania Department of Revenue, The Attorney General of the Commonwealth, and Freedom Credit Union, Respondents

### No. 98 M.D. 2005

#### *ORDER*

**AND NOW,** this 15th day of April, 2009, upon consideration of Petitioners' Application for Partial Discontinuance, and responses thereto, it is **ORDERED** and **DECREED** as follows: the Application is **DENIED.**[1]

/s/ Robert Simpson

---

1. When this original jurisdiction matter was previously before the Court on preliminary objections, Petitioners asserted that banks are similarly situated with credit unions and suffer unfair competition from credit unions. Petitioners asserted these points to establish standing as well as to counter demurrers. Petitioners argued that a factual record was needed before the Court could decide the issues. Largely on this basis certain preliminary objections were overruled. Petitioners now wish to avoid making a factual record.

No record on the issues of similar situation and unfair competition, or of standing generally, was developed before the Department of Banking in the matters in our appellate jurisdiction. *See Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 893 A.2d 864 (Pa.Cmwlth.2006) (opinion on appeals). Also, this Court believes some record is needed on these issues, for purposes of standing and for purposes of the merits of the claims. *See Pa. Bankers Ass'n v. Pa. Dep't of Banking*, (Pa.Cmwlth., Nos. 42 M.D. 2005, 98 M.D. 2005, filed March 1, 2006) (memorandum opinion on issues in original jurisdiction), Slip Op. at 8–9, 11–14. Further, Petitioners are taking a position materially different than that previously advanced to this Court, without explanation. *Id.*, Slip Op. at 10–11. Accordingly, we decline the invitation to discontinue some, but not all original jurisdiction matters.

### C. Orders of May 11, 2009

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Bankers Association and the Pennsylvania Business Bank, Petitioners

v.

Pennsylvania Department of Banking and TruMark Financial Credit Union, Respondents

No. 42 M.D. 2005

#### *ORDER*

**AND NOW,** this 11th day of May, 2009, upon consideration of Petitioners' Application for Reconsideration of the Court's Order Denying Petitioners' Unopposed Ap-

plication for Partial Discontinuance, it is **ORDERED** and **DECREED** as follows: the Application is **DENIED**.

**AND NOW,** this 10th day of May, 2009, upon consideration of Respondents' Application to Compel Petitioners' Responses to Discovery Requests, it is **ORDERED** and **DECREED** as follows: A **RULE** is entered upon Petitioners to **SHOW CAUSE** why said Application should not be granted; Petitioners shall file and serve responses to the Application on or before May 20, 2009; hearing on the Application is scheduled for May 27, 2007, immediately following the previously scheduled pre-trial conference (Order of November 10, 2008), at which time any evidence from any interested party relevant to the Application will be received.

/s/ Robert Simpson

### IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Bankers Association, Pennsylvania Business Bank, Fulton Bank, and Premier Bank, Petitioners

v.

Pennsylvania Department of Banking, Pennsylvania Department of Revenue, The Attorney General of the Commonwealth, and Freedom Credit Union, Respondents

No. 98 M.D. 2005

#### ORDER

**AND NOW,** this 11th day of May, 2009, upon consideration of Petitioners' Application for Reconsideration of the Court's Order Denying Petitioners' Unopposed Application for Partial Discontinuance, it is **ORDERED** and **DECREED** as follows: the Application is **DENIED**.

**AND NOW,** this 10th day of May, 2009, upon consideration of Respondents' Appli-

cation to Compel Petitioners' Responses to Discovery Requests, it is **ORDERED** and **DECREED** as follows: A **RULE** is entered upon Petitioners to **SHOW CAUSE** why said Application should not be granted; Petitioners shall file and serve responses to the Application on or before May 20, 2009; hearing on the Application is scheduled for May 27, 2007, immediately following the scheduled pre-trial conference (Order of November 10, 2008), at which time any evidence from any interested party relevant to the Application will be received.

/s/ Robert Simpson

### D. Orders of May 21, 2009

### IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Bankers Association and the Pennsylvania Business Bank, Petitioners

v.

Pennsylvania Department of Banking and TruMark Financial Credit Union, Respondents

No. 42 M.D. 2005

#### ORDER

**AND NOW,** this 21st day of May, 2009, upon consideration of Petitioners' Praecipe for Discontinuance of Count II (original jurisdiction), the above caption action is **DISCONTINUED WITH RESPECT TO ORIGINAL JURISDICTION ONLY.**

The pretrial conference scheduled for Wednesday, May 27, 2009, 10:00 a.m. in Courtroom number 1, Fifth Floor, Irvis Office Building, Harrisburg, Pennsylvania is **CANCELLED.**

The Hearing on the Application to Compel Petitioners' Responses to Discovery Request scheduled for Wednesday, May 27, 2009, following the pretrial conference, in Courtroom Number 1, Fifth Floor, Irvis

Office Building, Harrisburg, Pennsylvania is **CANCELLED.**

The non-Jury trial scheduled for Wednesday, June 24, 2009, 9:30 a.m., Courtroom Number 1, Fifth Floor, Irvis Office Building, Harrisburg, Pennsylvania is **CANCELLED.**

/s/ Robert Simpson

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Bankers Association, Pennsylvania Business Bank, Fulton Bank, and Premier Bank, Petitioners

v.

Pennsylvania Department of Banking, Pennsylvania Department of Revenue, The Attorney General of the Commonwealth, and Freedom Credit Union, Respondents

No. 98 M.D. 2005

### ORDER

**AND NOW,** this 21st day of May, 2009, upon consideration of Petitioners' Praecipe for Discontinuance of Count II (original jurisdiction), the above caption action is **DISCONTINUED WITH RESPECT TO ORIGINAL JURISDICTION ONLY.**

The pretrial conference scheduled for Wednesday, May 27, 2009, 10:00 a.m. in Courtroom number 1, Fifth Floor, Irvis Office Building, Harrisburg, Pennsylvania is **CANCELLED.**

The Hearing on the Application to Compel Petitioners' Responses to Discovery Request scheduled for Wednesday, May 27, 2009, following the pretrial conference, in Courtroom Number 1, Fifth Floor, Irvis Office Building, Harrisburg, Pennsylvania is **CANCELLED.**

The non-Jury trial scheduled for Wednesday, June 24, 2009, 9:30 a.m., Court-

room Number 1, Fifth Floor, Irvis Office Building, Harrisburg, Pennsylvania is **CANCELLED.**

/s/ Robert Simpson

### ORDER

AND NOW, this 28th day September, 2009, the orders of the Department of Banking, appearing at Dkt. Nos. APP–2003–01 and APP–203–01 are **AFFIRMED.**